DANIEL L. KELLER (SBN 191738)
**KELLER, FISHBACK & JACKSON LLP**
28720 Canwood Street, Suite 200
Agoura Hills, CA 91301
Telephone: 818.342.7442
Facsimile: 818.342.7616
Email: dkeller@kfjlegal.com

**Attorneys for Plaintiffs and the Proposed Class**
(*additional counsel listed on signature page*)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

QUINN ATTIKA, AMY BEATON, MORGAN BIVEN, STEPHEN BIVEN, DAVID BOWERMAN, ELIZABETH BOWERMAN, LAURIE GALBRAITH, ELISKA GIMENEZ-PICOU, NICHOLAS HRABOVSKY, JOHN NOVACK, SUSAN NOVACK, MICHAEL PARVIN, ON-UMA RADIGAN, REBECCA TAYLOR, ELIZABETH TORRES, and BINGYI YANG individually and on behalf of all others similarly situated,

Plaintiffs,

vs.

AMERICAN HONDA MOTOR COMPANY, INC.,

Defendant.

Case No.:

**CLASS ACTION COMPLAINT FOR DAMAGES**

**DEMAND FOR JURY TRIAL**

Plaintiffs Quinn Attika, Amy Beaton, Morgan and Stephen Biven, David and Elizabeth Bowerman, Laurie Galbraith, Eliska Gimenez-Picou, Nicholas Hrabovsky, John and Susan Novack, Michael Parvin, On-Uma Radigan, Rebecca Taylor, Elizabeth Torres, and Bingyi Yang ("Plaintiffs"), on behalf of themselves and all other similarly situated members of the below-defined state classes they seek to represent (collectively, the "Class" or "Classes"), bring this action against Defendant American Honda Motor Company, Inc. ("Honda"), based upon personal knowledge as to the factual allegations pertaining to themselves, and based upon information and belief and the investigation made by their undersigned attorneys as to all other matters, as follows:

## NATURE OF THE ACTION[1]

1. Plaintiffs bring this action individually and on behalf of Classes of similarly situated owners and lessees who purchased or leased white-painted Honda or Acura vehicles in all model years from 2013 to the present, including:

> The Acura MDX, the Honda Civic, Honda CR-V, Honda Fit, Honda HR-V, Honda Odyssey, and the Honda Pilot, painted with the following colors (and corresponding paint codes): White Diamond Pearl (NH-603P); Taffeta White (NH-578); White Orchid Pearl/Bellanova White (NH-788P); and Platinum White Pearl (NH-883P) (collectively, the "Class Vehicles").

2. The Class Vehicles all suffer from a paint defect which causes their paint to inevitably peel, delaminate (the various paint layers separate due to adhesion issues), bubble, and flake (the "Paint Defect").

3. The Paint Defect existed in latent form when Honda manufactured the

---

[1] On March 18, 2026, in a related case arising from white paint peeling on Acura and Honda vehicles, the Court struck the claims of Plaintiffs Attika, Bowerman, Gimenez-Picou, Novack, and Torres without prejudice. *See Clemmens v. Am. Honda Motor Co., Inc.*, No. 2:24-CV-09728-ODW (SKX), 2026 WL 765426, at *11 (C.D. Cal. Mar. 18, 2026). The Court determined that adding those Plaintiffs in an amended complaint exceeded the scope of the Court's Order granting leave to amend. *See id.* Plaintiffs Beaton, Biven, Galbraith, Hrabovsky, Parvin, Radigan, Taylor, and Yang have not previously asserted their claims against Honda in *Clemmens* or in any other case or forum.

vehicles and when Plaintiffs purchased the vehicles. However, as demonstrated by innumerable consumer complaints, the Paint Defect invariably manifests during the reasonably expected life of the Class Vehicles, causing paint failure, peeling, delaminating, bubbling, and flaking.

4. The Paint Defect stems from a defect in the paint itself; a defect in the paint when applied to the Class Vehicles' exterior; and/or a defect in Honda's manufacturing process, including the complexities of using "three-stage" white paint to give the Class Vehicles their pearlescent or metallic finish.

5. Choosing paint color is one of the most important aspects of vehicle purchases or leases, including for Plaintiffs and Class members when they purchased the Class Vehicles. Automakers paint vehicles to enhance aesthetics (color, gloss, and appearance) and to provide necessary functionality (chemical and corrosion-resistance to protect the body of the vehicle). If any of these purposes in selecting material and painting the vehicle is compromised, then vehicle aesthetics are ruined, the value of the vehicle is greatly diminished, and an integral component of the car will likely fail, causing further damage in the form of rust and corrosion. Therefore, truthful and complete information regarding paint quality and durability was highly material to Plaintiffs and Class members prior to and at the point of sale of the Class Vehicles.

6. As detailed below, at all relevant times (late 2012[2] to the present), Honda has known about the Paint Defect based on: (i) internal testing; (ii) four Technical Service Bulletins ("TSBs") addressing substantially similar paint problems affecting Honda vehicles in 2008, 2012, 2013, and 2014;[3] (iii) three TSBs specifically addressing the Paint Defect in 2019; (iv) countless consumer complaints about the Paint Defect; and (v) at least one other substantially similar class action lawsuit filed in Canada,

---

2 Honda began selling 2013 Class Vehicle models in late 2012.

3 A Technical Service Bulletin (TSB) is a document that provides instructions for repairing a vehicle when a manufacturer identifies a recurring problem. TSBs are created when a manufacturer receives information from dealers and customers about common issues, and then addresses them once a fix is approved

which Honda's affiliate settled in 2022 for approximately $27 million in available relief.

7. Honda has had exclusive and superior knowledge about the Paint Defect, which was material to Plaintiffs and Class members, who could not reasonably know about the Paint Defect when purchasing their Class Vehicles. As a result, and at all relevant times, Honda and its authorized dealers had a duty to disclose the latent Paint Defect at the point of sale or lease of the Class Vehicles.

8. Despite that knowledge and duty, Honda and its authorized dealers failed to disclose, and even actively concealed, the Paint Defect and made incomplete representations about the Class Vehicles' paint and available paint colors. During the relevant time, Honda and its authorized dealers also marketed the Class Vehicles as luxurious, stylish, durable, high-value, and value-retaining vehicles despite their knowledge about the Paint Defect.

9. In 2019, after receiving a wave of complaints about the Paint Defect, Honda finally acknowledged the issue and implemented various TSBs extending the warranties on a subset of Class Vehicles to cover repairs of the Paint Defect, providing detailed instructions to its authorized dealers regarding when Honda's authorized dealers were required by Honda to repair the Paint Defect, and providing detailed instructions concerning how Honda's authorized dealers were to repair the Paint Defect when permitted to by Honda.

10. Honda's extended warranties failed to provide an adequate remedy to the Class because they were provided without Honda sending adequate notice; provided no relief unless the Paint Defect had manifested and paint was actively peeling; provided no repairs to Class members who owned or leased excluded Class Vehicles; were arbitrarily and improperly honored by Honda and its authorized dealers; and provided inadequate repairs that did not restore the Class Vehicles to their bargained-for value. Moreover, with the current expiration of its inadequate warranty remedies, Honda and its authorized dealers have refused, and continue to refuse, to provide

repairs or any other meaningful remedy to those who have suffered economic harm caused by the Paint Defect.

11. Plaintiffs and Class members relied on Honda's misrepresentations and materials omissions and purchased and leased Class Vehicles that they would not have purchased or leased, or would have paid far less for, had they known of the Paint Defect. Plaintiffs and Class members have consequently suffered ascertainable losses and actual damages caused by Honda's unlawful conduct.

12. As a direct and proximate result of Honda's deceit regarding, and failure to disclose, the Paint Defect, Plaintiffs and Class members: (1) overpaid for their Class Vehicles; (2) have Class Vehicles that have suffered premature and unsightly paint failures that substantially diminish vehicle value; and/or (3) have spent substantial money to have their Class Vehicles (inadequately) repainted.

13. The Paint Defect thus decreases the value of the Class Vehicles, forcing Class members to either live with the problems caused by the Paint Defect or spend significant money—or hope that Honda will cover the cost—to have the Class Vehicles repainted. Even then, repainting an impacted panel does not cure the Paint Defect because the remaining parts of the Class Vehicle still suffer from the latent Paint Defect. Moreover, repainting the Class Vehicles results in a cosmetic defect that permanently decreases the Class Vehicle's value.

14. Plaintiffs, individually and on behalf of all others similarly situated in the Classes, bring claims against Honda for violating: (1) California's Unfair Competition Law; (2) California's False Advertising Law; (3) California's Consumers Legal Remedies Act; (4) the Georgia Fair Business Practices Act; (5) the Georgia Uniform Deceptive Trade Practices Act; (6) the Illinois Consumer Fraud Act; (7) the Indiana Deceptive Consumer Sales Act; (8) Kentucky Consumer Protection Act; (9) the Minnesota Prevention of Consumer Fraud Act; (10) the Minnesota Uniform Deceptive Trade Practices Act; (11) the Missouri Merchandising Trade Practices Act; (12) North Carolina Unfair and Deceptive Trade Practices Act; (13) the South Carolina Unfair

Trade Practices Act; (14) the Texas Deceptive Trade Practices Act; (15) the Virginia Consumer Protection Act; (16) the Washington State Consumer Protection Act; (17) the Wisconsin Deceptive Trade Practices Act; and (18) unjust enrichment.

15. Plaintiffs on behalf of themselves and the Class members seek actual and/or compensatory damages, restitution and other equitable relief including an injunction requiring Honda to repair or pay to repair the Paint Defect, among other things.

## PARTIES

### A. Plaintiffs

16. Plaintiff Quinn Attika is a resident of West Palm Beach, Florida and is a citizen of Florida. Ms. Attika owns a 2019 Honda Fit in White Platinum Pearl paint.

17. Plaintiffs Morgan and Stephen Biven are residents of Louisville, Kentucky and are citizens of Kentucky. The Bivens own a 2018 Honda HR-V in White Orchid Pearl paint.

18. Plaintiff Amy Beaton is a resident of Racine, Wisconsin and is a citizen of Wisconsin. Ms. Beaton owns a 2020 Honda Pilot in Platinum White Pearl paint.

19. Plaintiffs David and Elizabeth Bowerman are residents of Smyrna, Georgia and are citizens of Georgia. The Bowermans own a 2016 Acura MDX in White Diamond Pearl paint.

20. Plaintiff Laurie Galbraith is a resident of Porter, Indiana, and is a citizen of Indiana. Ms. Galbraith owns a 2017 Honda HR-V in White Orchid Pearl paint.

21. Plaintiff Eliska Gimenez-Picou is a resident of Virginia Beach, Virginia, and is a citizen of Virginia. Ms. Gimenez-Picou owns a 2019 Honda HR-V in Platinum White Pearl paint.

22. Plaintiff Nicholas Hrabovsky is a resident of St. Louis, Missouri and is a citizen of Missouri. Mr. Hrabovsky owns a 2015 Acura MDX in White Diamond Pearl paint.

23. Plaintiffs John and Susan Novack are residents of Bradenton, Florida, and are citizens of Florida. The Novacks own a 2018 Honda HR-V in White Orchid Pearl

paint.

24. Plaintiff Michael Parvin is a resident of Port Royal, South Carolina, and is a citizen of South Carolina. Mr. Parvin owns a 2018 Honda Civic in White Platinum Pearl paint.

25. Plaintiff On-Uma Radigan is a resident of Seattle, Washington and is a citizen of Washington. Ms. Radigan owns a 2017 Honda HR-V in White Orchid Pearl paint.

26. Plaintiff Rebecca Taylor is a resident of New Lenox, Illinois and is a citizen of Illinois. Ms. Taylor owned a 2016 Honda HR-V in White Orchid Pearl paint.

27. Plaintiff Elizabeth Torres is a resident of Naples, Florida and is a citizen of Florida. Ms. Torres owns a 2017 Honda HR-V in White Orchid Pearl paint.

28. Plaintiff Bingyi Yang is a resident of Greenville, South Carolina and is a citizen of South Carolina. Mr. Yang owns a 2015 Acura MDX painted in White Diamond Pearl paint.

**B. Defendant**

29. Honda is a California corporation with its principal place of business at 919 Torrance Blvd., Torrance, California 90501.

30. Honda is the United States sales and marketing subsidiary of, and is wholly owned by, Honda Motor Company, Ltd, a Japanese corporation, with its principal place of business at 2-1-1, Minami-Aoyama, Minato-Ku, Tokyo 107-8556 Japan. Honda is responsible for designing, manufacturing, distributing, marketing, selling, and servicing Acura and Honda vehicles in the United States, including the Class Vehicles.

31. At all relevant times, and as further detailed below (Section E), Honda's authorized dealers were acting as Honda's agents, including when Plaintiffs and Class were considering purchasing and were purchasing their vehicles, when addressing Plaintiffs' and the Classes' repair requests, and when attempting to repair the Paint Defect.

## JURISDICTION AND VENUE

32. This Court has original jurisdiction over this case under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). Minimal diversity exists between members of the proposed Classes and Honda. Plaintiffs are citizens of Florida, Georgia, Illinois, Indiana, Kentucky, Missouri, South Carolina, Virginia, Washington, and Wisconsin. Honda is a citizen of California. In addition, the amount in controversy in this action exceeds $5,000,000, exclusive of interest and costs, and there are more than 100 members in the proposed Classes.

33. This Court has personal jurisdiction over Honda. Honda's principal place of business is in California, and/or Honda is engaged in systematic and continuous business activity in California, has sufficient minimum contacts in California, or otherwise intentionally avails itself of the California consumer market.

34. Venue is proper in this District pursuant to 28 U.S.C. § 1391. Honda's principal place of business is in this District, and a substantial portion of the events or omissions giving rise to Plaintiffs' claims occurred in this District, including oversight of the design, manufacturing, distribution, marketing, sale, and service of the Class Vehicles.

## FACTUAL BACKGROUND

### A. The Class Vehicles and Honda's Marketing

35. The Acura MDX is a mid-sized luxury crossover SUV that was first introduced to the US market in October 2000. The Honda Civic is a compact car that has been produced by Honda since 1972 and is one of its most popular models. The Honda CR-V is a compact crossover SUV that Honda introduced in 1995. The Honda Fit is a subcompact hatchback car manufactured and marketed by Honda since 2001 over four generations. The Honda HR-V is a subcompact crossover SUV manufactured and marketed by Honda over three generations. The Honda Odyssey is a minivan that was introduced by Honda in 1994. The Honda Pilot is a mid-size crossover SUV with three-row seating manufactured by Honda since 2002.

36. Throughout the years, and at all relevant times, Honda consistently and widely marketed the Class Vehicles as high-value, value-retaining, stylish, luxurious, and durable vehicles.

37. Honda directly markets the Class Vehicles to consumers via extensive nationwide, multimedia advertising campaigns on television, the Internet, billboards, print publications, mailings, and through other mass media.

38. Honda marketed Class Vehicles for their ability to retain residual value. For example, in a June 2013 press release, Honda stated that the "Honda Odyssey led the minivan segment for maintaining the highest projected residual value after five years of ownership as a percentage of value when new," an attribute Honda emphasized applied for all Class Vehicles:

> "Honda models definitely punch above their weight when it comes to value with class-leading quality, safety ratings, standard features and a company commitment to avoid value-sapping fleet sales" said Mike Accavitti, senior vice president of automobile operations for American Honda."

39. Likewise, Honda repeatedly touted the Acura MDX as a winner of the U.S. News & World Report Best Cars for the Money Award, including in 2014:

- "Acura's hottest sellers, MDX luxury sport utility vehicle and RDX luxury crossover SUV, have won U.S. News & World Report's 2014 awards with MDX taking the 'Best Luxury 3-Row Midsize SUV For The Money' award and RDX winning the 'Best Luxury Compact SUV For The Money' category.'
- "'The MDX and RDX continue to win accolades for their outstanding combination of exhilarating, performance, great fuel efficiency, and outstanding value on a luxury scale,' said Jeff Conrad, vice president and general manager of Acura Sales. 'With the five-passenger RDX and new seven-passenger MDX, Acura has unquestionably two of the most competitive luxury SUVs in the market.'"[4]

[4] https://acuranews.com/en-US/releases/release-

40. In 2018, Honda issued a press release stating that it claimed five Kelley Blue Book Best Resale Value awards:

> Honda has earned multiple accolades in the 2018 Kelley Blue Book Resale Value Awards with the all-new 2018 Accord and Odyssey, plus 2018 Fit and HR-V all taking home top honors in their respective segments and the 2018 Ridgeline making the top 10 for Best Overall Resale Value.
>
> The 2018 Kelley Blue Book Best Resale Value Awards honor automakers' outstanding achievements in producing vehicles that best retain their value over the first five years (60 months) of new-vehicle ownership, a very good indicator of a model's overall value-retention ability.

41. Honda made substantially similar representations regarding residual value, the ability to retain value, style, luxury, and durability in product brochures and other marketing for all Class Vehicles in all model years.

42. Honda advertised the Class Vehicles' exterior paint as a central and integral attribute of the Class Vehicles, an attribute that was necessary to complement the Class Vehicles' value, ability to retain value, style, luxury, and durability.

43. For instance, the 2016 Honda HR-V brochure stated, before listing available paint colors (including White Orchid Pearl for all trim levels): "[f]unctionality versatility and efficiency are all important in a vehicle—and the HR-V is definitely all those things. But let's not kid ourselves: looks matter too. Fortunately, the HR-V overdelivers in that department. By a mile."

44. In the 2014 Acura MDX press kit, Honda made the following representations regarding the durability and resilience of the Acura MDX's paint and suggested that the Class Vehicles' paint was essential to "compliment" the Acura MDX's luxury design, including the White Diamond Pearl paint:

- The 2014 MDX is available in seven exterior colors, including three metallic and four pearl colors. **All colors**

---

352eda959a624dac96bc7a6b06004c1a-acura-mdx-and-rdx-win-u-s-news-world-report-2014-best-cars-for-the-money-awards.

> **are expressive and luxurious in appearance, complimenting [sic] the MDX's sophisticated and dynamic body shape. The acid-resistant epoxy clear-coat paint is superior to typical clear-coat paints for increased resistance to urban pollutants**:
>
> - Silver Moon Metallic
> - Crystal Black Pearl
> - Dark Cherry Pearl
> - Forest Mist Metallic
> - Graphite Luster Metallic
> - Fathom Blue Pearl
> - White Diamond Pearl[5] (emphasis supplied).

45. Honda made substantially similar representations regarding the Class Vehicles' paint in marketing materials for Class Vehicles. For example, the 2014 Honda Odyssey brochure encouraged consumers to find the "perfect" combination between exterior and interior colors, including White Diamond Pearl. The 2015 Honda Fit brochure emphasized the model's "complete redesign," encouraged consumers to "choose the right fit," and highlighted the various available paint colors, including White Orchid Pearl.

46. Honda's marketing has enabled it to charge consumers premium prices for the Class Vehicles. For example, the price range for a 2025 Acura MDX is $50,900 to $74,850.

47. Moreover, the Class Vehicle models are some of the highest-selling vehicles in the United States market during the relevant time frame because of Honda's marketing of the Class Vehicles as high-value, value-retaining, stylish, luxurious, and durable vehicles and its failure to disclose the Paint Defect to purchasers and lessees.

48. For example, on July 11, 2014, Honda issued the following press release, highlighting the 2014 Acura MDX as the highest selling three-row luxury SUV of all

---

[5] As one other example, in the 2017 Acura MDX Press Kit, Honda made the following representations regarding the durability of Class Vehicles' paint: "All colors are expressive and luxurious to compliment the redesigned MDX's sophisticated and dynamic body shape. The acid-resistant epoxy clear-coat paint is superior to typical clear-coat paints for increased resistance to urban pollutants."[5]

time: “Record sales in the first six months of 2014 have strengthened the third-generation MDX's position as America's best-selling three-row luxury SUV–not only in 2014, but of all time . . . .”

49. Honda sold approximately 550,000 Acura MDXs between 2014 and 2023 to Plaintiffs and other Class members based on Honda’s effective branding of the Acura MDX. The other Class Vehicles have found similar sales success based on Honda’s marketing of the Class Vehicles as high-value, value-retaining, stylish, luxurious, and durable vehicles.

50. As a result of Honda’s marketing, Plaintiffs and Class members formed a reasonable expectation that the Class Vehicles’ paint was high quality, would endure, and would positively impact the long-term value of the Class Vehicles. Unlike tires, batteries, and engine oil, which need regular replacement, in modern vehicles, particularly luxury vehicles, automobile paint is expected to last the lifetime of the vehicle, such that, absent an accident, a vehicle owner reasonably would not expect to have to spend thousands of dollars to have their vehicle stripped and repainted during the ownership of the car.

51. Furthermore, Plaintiffs and Class members paid a premium to purchase their Class Vehicles in white paint, as white is generally the most popular paint color for the Class Vehicles and vehicles painted white are generally more expensive when compared with vehicles in other colors.

52. Likewise, based on the marketed durability and longevity of the Class Vehicles, Plaintiffs and Class members formed a reasonable expectation that the Class Vehicles’ paint would last a time commensurate with the useful life and longevity of their Class Vehicles, that is, a time frame well-exceeding ten years. Recent data from S&P Global Mobility, which tracks state vehicle registration data nationwide, indicates that the average American currently keeps their vehicles a record 12.6 years.

53. Class members confirm that a substantial portion of Class Vehicles remain on the road more than ten years after Honda sold or leased them. For example, Acura

MDX owners widely note on various online sources that their Acura MDXs have reliably driven well-over ten years and well over 100,000 miles, especially with regular maintenance.[6] Plaintiffs and Class members reasonably expected that the Class Vehicles' paint would remain intact for that same duration and would not fail, peel, delaminate, flake, or bubble under normal conditions during the reasonably expected life of the Class Vehicles.

54. Plaintiffs and Class members were exposed to and relied on Honda's pervasive, long-term, national, multimedia marketing campaign touting the supposed value, residual value, style, luxury, and durability of the Class Vehicles, including the quality and durability of the exterior paint (and the exterior paint's ability to complement the aesthetics and style of the Class Vehicles). Plaintiffs and Class members justifiably made their decisions to purchase and/or lease their Class Vehicles based on Honda's misleading marketing.

55. However, Honda did not manufacture or sell Class Vehicles with durable, high-quality paint complementing the Class Vehicles' "sophisticated and dynamic body shape" and lasting the Class Vehicles' expected useful life. Instead, Honda knowingly manufactured and sold the Class Vehicles with a Paint Defect that causes paint failure, peeling, delaminating, bubbling, and flaking during the expected life of the Class Vehicles, greatly reducing their value, and resulting in costly repairs.

56. Plaintiffs and other consumers did not and could not know of the Paint Defect, which was caused by Honda's internal and proprietary design specifications or manufacturing processes. Moreover, Plaintiffs could not discover the latent Paint Defect through reasonable inspection of the Class Vehicles or other reasonable means until, at the earliest, the Paint Defect caused paint failure, peeling, delaminating,

---

[6] *E.g.*, https://www.mdxers.org/threads/looking-for-who-has-the-most-miles-on-their-mdx.85426/;https://www.mdxers.org/threads/how-many-miles-on-your-2nd-gen-mdx.40925/page-13?post_id=1581164&nested_view=1&sortby=oldest#post-1581164; https://www.reddit.com/r/Acura/comments/15fylsa/how_many_miles_has_your_acura_mdx_which_year/.

bubbling, and flaking.

**B. Honda's Paint Process and the Paint Defect**

57. The Class Vehicles suffer from a Paint Defect which causes their white paint to prematurely fail, bubble, peel, delaminate, and flake.

58. The Paint Defect is caused by a systemic defect in the white paint; the white paint as applied to the Class Vehicles' exterior materials; and/or the manufacturing processes Honda used to apply the white paint. In the warranty extension notices it provided to a very limited and inadequate subset of Class members, Honda stated that the Paint Defect "is related to the method by which the factory applied the paint."[7]

59. The Paint Defect is not associated with geography or other environmental factors because it impacts Class Vehicles in every state, regardless of climate or other geographical factors (such as proximity to cities and pollution exposure). Moreover, the Paint Defect only impacts Class Vehicles (all painted white), as opposed to Honda vehicles painted in other colors.

60. During the relevant timeframe, the Class Vehicles were primarily manufactured in Honda's Lincoln, Alabama automobile factory using a robotic paint system.

61. The Honda painting process involves several critical steps:

- Each body is cleaned and degreased, and then undercoated by immersion in a zinc-phosphate bath.
- The body is then dipped in a soluble, electro-deposited primer (called an e-coat).
- To prevent dust and moisture from accumulating in critical areas, special sealants are sprayed into crevices and seams in the body.
- Areas of the body that are susceptible to stone and gravel damage are coated with a special anti-chipping primer.
- An intermediate primer coat is applied, followed by either a polyester-resin or acrylic-resin topcoat and, if a metallic or pearlescent paint color is involved, a mid-coat.

---

[7] https://static.nhtsa.gov/odi/tsbs/2019/MC-10163816-0001.pdf.

- Metallic and pearlescent paints—like those involved in this case—receive an additional clear coat.

62. The Paint Defect stems from: (1) the white paint applied to Class Vehicles itself; (2) issues involved in applying "three-stage" or "tri-coat" paint on a vast majority of the Class Vehicles, including the Diamond White Pearl, White Orchid Pearl, Bellanova White paint colors (and now widely failing, bubbling, peeling, delaminating, and flaking); and/or (3) issues with the Class Vehicles' primer, e-coat, and clear coat paint layers.

63. In most cars, there are only two primary paint layers, starting with the colored "base coat" at the bottom, and then topped with a "clear coat." With a three-stage paint, however, there is an additional "mid coat" pearl or metallic paint layer between the base coat and the clear coat.

64. Three-stage paints add a sparkling finish to a car's overall paintwork, giving the surface a sense of depth or richness that two layers alone would not be able to accomplish. Due to aesthetic benefits, three-stage painted cars are more appealing and costly to consumers, including the Class Vehicles.

65. However, three-stage paints like the paint colors underlying the Paint Defect are far more likely to peel or delaminate, as well understood by car manufacturers (including Honda) and as seen in the Class Vehicles. Key factors contributing to the early peeling of three-stage paints include:

- Inconsistent Application: The process requires meticulous precision. Any variation in the application of the clear coat or insufficient curing can lead to adhesion problems, resulting in premature peeling; and
- Complexity and Cost: The additional layers in three-stage paints increase both cost and application difficulty. Minor defects during production were more likely to result in long-term durability issues.

66. The three-stage pearl paints used on Class Vehicles were prone to peeling, delaminating and other issues due to a latent defect in the "three-stage" white paint itself, or in the manufacturing process (such as an inconsistent application of the paint) Honda used to apply the white paint during the relevant timeframe.

67. In addition, primer is an essential element in the quality of the adhesion between the e-coat and the basecoat. Primers must be tested for their ability to withstand "chemical reactivity" to UV light and extreme weather conditions because disintegration of any agents within the primer will likely cause "a drastic loss of adhesion and delamination of the topcoat [clearcoat]."[8] The durability of the paint, and the prevention of corrosion, is dependent upon the adhesion of the layers of the paint system, including the e-coat, primer, and clear coat layers.

68. Intercoat adhesion of all paint layers—including the Class Vehicles' e-coat, primer, and clear coat layers–is a critical determinant of the Class Vehicles' paint quality. Achieving excellent performance and application properties of any paint requires a holistic approach to ensure compatibility, not only within a paint formulation across all ingredients, but also between the paint formulation and the paint system used for the application of the paint, so that all paint layers can properly work together and bring out those properties. An inadequate layer or poor adhesion between layers (i.e., poor intercoat adhesion) is the weakest link of a paint system, and greatly increases the probability of paint system failure, such as the peeling, delaminating, and other paint issues at issue in this case.

69. Degradation of the e-coat and primer coatings in an automotive paint system—as was highly likely in the case (in addition to issues related to the white paint's three-stage painting process)—can be caused by the defective nature of the materials and paint layers used or the improper manner in which they are applied during the painting process, resulting in accelerated degradation at the interface between the clear, mid-coat, and/or basecoat. This degradation causes a loss of adhesion and will manifest as peeling or delaminating, and eventually rusting and damage to the vehicle's exterior, as well as damage to the vehicle's efficiency, reliability, and appearance. This is what happened and is happening to the Class Vehicles.

---

[8] *Nelson K. Akafuah, et al., Evolution of the Automotive Body Coating Process—A Review,*
*MDPI* (June 13, 2016), p. 20, http://www.mdpi.com/2079-6412/6/2/24.

**C. The Paint Defect Is Widespread in the Class Vehicles, and in 2019, Honda Implemented (Inadequate) Extended Warranty Programs**

70. As demonstrated by a multitude of complaints and reports made by owners and lessees of Class Vehicles, the Paint Defect is a ubiquitous issue for Class Vehicles and manifestation of the Paint Defect is almost a certainty at this point.

71. Class member reports relating to the Paint Defect bear striking similarities to one another and (as further detailed below) the Plaintiffs' experiences with the Paint Defect and Honda's response to the Paint Defect, including:

- Reports of premature paint failure, such as peeling, delaminating, bubbling, and flaking during the reasonably expected life of Class Vehicles;
- Reports of Honda, auto paint technicians, and auto body repair shops being well-aware of the Class Vehicles' Paint Defect;
- Reports of the inadequacy and arbitrary administration of Honda's warranties and extended warranties directed toward the Paint Defect;
- Reports of Honda or its agents' improper refusal to repair the Paint Defect; and
- Reports of high estimates and high costs to repair the Paint Defect, inadequate repairs, and risk of further paint failure (stemming, for instance, from the repainting of only one panel as opposed to the whole car).

72. On MDXERS.org, a popular forum for Acura MDX owners, Class members on a forum thread titled "2016 MDX Roof Paint Peeling VIN Specific" describe their experience with the Paint Defect and with Honda as follows:[9]

- Acu2016 on Feb. 15, 2024
  - Our 2016 MDX with white diamond pearl paint just started peeling on the roof and it's getting worse. Thanks to this forum, I found out that Acura has 8 year Warranty Extension TSB 19-029 on 2014-2016 MDX with white diamond pearl paint.
    So I called Acura. After the rep did the search on their system, I was

[9] https://www.mdxers.org/threads/2016-mdx-roof-paint-peeling-vin-specific.182510/

told that our VIN number is not in the list that qualify for this warranty extension. Even though the our MDX has exact problem described on TSB and it's within 8 year time and the model.
I requested to talk to the case manager and now I'm waiting to hear from them. I told them I want to send the photos and spoke with 7 different shops. All the shops said the same. It's the manufacturer paint failure.

- J-Rods on Feb. 19, 2024
  - I have the same exact peeling paint in the exact same spot. Spoke with the Honda America rep and was told the same. My vin is not in range. I asked if they changed the paint & if so, it didn't work. Asked to speak with someone else above the rep in management and was denied. I was asked to complete their survey and I was honest. I gave the lowest rating possible & need to figure out the next step Will be reaching out to an attorney for advice.

- Serius on Feb. 28, 2024
  - I also have the same peeling at the same spot on my white diamond pearl 2016 MDX. Honda America also denied my claim for the same reason: VIN not in range. I bought my car on August 2015, and the issue occurred on Sept 2023. I filed the claim on through Acura dealer a week after the peel occurs, and Honda America said the extended warranty started from the date the car rolls out from the factory (May 2015), not the date I bought the car.
    Please let me know if there is a class action lawsuit and I will be happy to join

- ppruiett27 on Mar. 2024
  - Yes, I just noticed this weekend. We called Acura and they also said since its been past 8 years more like 9 1/2 they are denying. It is obviously a paint problem as it delaminated all the way to the metal. No help from the dealer or Acura Warranty. If you get anywhere please let us know. I am very disappointed.

- Miles2016 on Mar. 12, 2024
  - New to this Forum~ Isn't there strength in our numbers ? I had my transmission changed out due to faulty shifting, the dealer discovered it when I was doing my 100K tune up~ the dealer took care of it in (2023) with no charge to me, why not fixing this paint issue ?

- Joie on Mar. 22, 2024
  - Same issue here. Didn't really notice the issue during the COVID years and now a massive spot around the front roof. Honda USA said they won't cover it because the 8 years has passed. Bunch of clowns.

- Bill G on Apr. 5, 2024
  - Same here! Got denied even though it is a well known problem. Unfortunately our 2015 was manufactured in 2014 and is over the 8 year mark. I'd certainly sign on to a class action!! Paying all that money to have paint peel off prematurely is ridiculous…

- Beckyrob84 on Apr. 15, 2024
  - I have a 16 with the correct paint code. And this Saturday i walked outside and saw a huge chip of paint missing from the roof. Called Acura and it was out due to the time of when the vehicle was purchased. This is absolutely insane! Something needs to change

- Erkuan on Apr. 15, 2024
  - Same here. I got 2016 MDX in 2015 and just exceeded the warranty for couple of month. The Honda rejected to pay for the repair and the local dealer did nothing to help me.

- Whtdiamondpearlpurgatory on May 13, 2024
  - Anyone having any luck here? I have a 2016 MDX with this issue. The rooftop paint actually started peeling in 2019 and at the time we took it to our Acura dealer and had it repainted under warranty (though of course they contracted out the paint work to a body shop). Just this week it started peeling AGAIN, just behind the sunroof. So far I am getting stonewalled at all levels, corporate reps are telling me it's hopeless. What a terrible experience, especially for a "luxury" brand. We did the right thing and the issue SHOULD HAVE been addressed in 2019, and now I'm told there is no recourse since the 8-year extended warranty is up. I feel like there should be an exception given that we took it to them for repair and the underlying issue was not addressed. But I'm running out of ideas.

- minh.b.nguyen on May 28, 2024
  - same problem here...was told by Acura America and dealer tough luck...so much for "luxury vehicle".

- Randramey on June 19, 2024
    - I agree. I called the Acura dealer in San Jose and they told me the same thing. I told them that the problem just started a month and a half ago, so when they told me that it was out of the extended warranty, I was angry.
      With all of the claims that are identical, there needs to be something done. Like a Class Action lawsuit. American Honda is showing how their "plausible deniability" is a true reflection that they really don't care about their customers. The dealer even stated that they could not give me a discount of the body work. I have been buying Acura's for the past 15 years; however, I am done.

73. This is a sample of the complaints on MDXer.org, which is just one of a slew of forum threads on the Paint Defect manifestation in the Acura MDX, each of which contains sometimes dozens of replies describing experiences with the Paint Defect and Honda's refusal to address the issue.[10]

---

[10] *E.g.*, (1) White Pearl Paint Peeling from 2012 Acura MDX, https://www.mdxers.org/threads/white-pearl-paint-peeling-from-2012-acura-mdx.173528/?post_id=1613669&nested_view=1&sortby=oldest#post-1613669; (2) 2016 Roof Paint Peel Not Covered Under Extended Warranty/Recall, https://www.mdxers.org/threads/2016-roof-paint-peel-not-covered-under-extended-warranty-recall.180931/?post_id=1612987&nested_view=1&sortby=oldest#post-1612987; (3) Pearl White Paint Recall Story, https://www.mdxers.org/threads/pearl-white-paint-recall-story.178147/?post_id=1612981&nested_view=1&sortby=oldest#post-1612981; (4) 2016 Roof Paint Peel Not Covered Under Extended Warranty/Recall, https://www.mdxers.org/threads/2016-roof-paint-peel-not-covered-under-extended-warranty-recall.180931/?post_id=1610874&nested_view=1&sortby=oldest#post-1610874; (5) Paint peeling problem for 2014 MDX White Diamond Pearl, https://www.mdxers.org/threads/paint-peeling-problem-for-2014-mdx-white-diamond-pearl.180088/?post_id=1610456&nested_view=1&sortby=oldest#post-1610456; (6) How much to paint the roof - is it worth it before trading? Paint peeling issue., https://www.mdxers.org/threads/how-much-to-paint-the-roof-is-it-worth-it-before-trading-paint-peeling-issue.183186/?post_id=1608426&nested_view=1&sortby=oldest#post-1608426; (7) 2014 MDX White Pearl Peeling Paint - Need TSB info, https://www.mdxers.org/threads/2014-mdx-white-pearl-peeling-paint-need-tsb-info.178594/?post_id=1608174&nested_view=1&sortby=oldest#post-1608174; (8)

74. One other thread titled Brand new 2014 MDX Paint peeling, posted by "nelci" on October 9, 2013 (prior to Plaintiffs' purchases), states the following:

> Hi,
> Bought a brand new 2014 SH-AWD MDX Tech Pearl white on 09/21/2013. Paid total $53000 for it.
> After a week while washing the car, I saw a black patch and realized the paint is peeling off on the front A pillar passenger side.
> Contacted the dealer and Acura claims.
> They are offering to paint the car. Re-painting a brand new car very disappointing.
> They claim car does not depreciate in value because of this, but does not want to give it in writing.
> Also, they do not want to warranty the life time of the new paint will be as good as OEM paint.
> Really appreciate any suggestions on how to deal with the problem.

75. Reports of the Paint Defect in the Acura MDX are not only limited to MDXER.org but, instead, are confirmed elsewhere on the internet, including on the National Highway Traffic Safety Administration website,[11] CarComplaints.com,[12] AcuraZine.com (another popular Acura forum);[13] and Reddit.com,[14] among other

---

PSA: 2014-2016 White Diamond Pearl Sucks, https://www.mdxers.org/threads/psa-2014-2016-white-diamond-pearl-sucks.170150/page-2?post_id=1596678&nested_view=1&sortby=oldest#post-1596678; (9) White paint, https://www.mdxers.org/threads/white-paint.181496/?post_id=1594658&nested_view=1&sortby=oldest#post-1594658; (10) White Diamond Pearl peeling??, https://www.mdxers.org/threads/white-diamond-pearl-peeling.174242/?post_id=1526860&nested_view=1&sortby=oldest#post-1526860; (11) Painted the roof black!, https://www.mdxers.org/threads/painted-the-roof-black.172434/; Peeling paint on 2017 MDX, https://www.mdxers.org/threads/peeling-paint-on-2017-mdx.183087/.

[11] *E.g.*, https://www.nhtsa.gov/?nhtsaId=11583646.

[12] *E.g.*, https://www.carcomplaints.com/Acura/MDX/2014/body_paint/paint_issues.shtml.

[13] https://acurazine.com/forums/3g-mdx-2014-2020-414/mdx-paint-peeling-off-980490.

[14] https://www.reddit.com/r/Acura/comments/1aslcss/acura_mdx_peeling_

sources.

76. Owners and lessees of Class Vehicles in other makes and models have made substantially similar widespread complaints of the Paint Defect. Honda Odyssey owners and lessees, for instance, have reported the following on Odyclub.com, a popular Honda Odyssey forum:[15]

- VanMorrison on June 14, 2024
  - Yep, same here. Their unwillingness to stand by their paint has ensured that I'll never again purchase another Honda product. I've owned many cars and NEVER had paint issues like this. I had a Benz for 15+ years that never had similar issues and we've had a Tesla now for 7 years, and for all the people yapping about poor Tesla paint quality, the Tesla has more miles than the Odyssey and the paint is immaculate. Meanwhile, this supposedly top of the line Odyssey is shedding it's skin like a ghoul in Fallout....
    Honda can seriously go paint themselves.
- Kristylea on April 6, 2024
  - My 2014 Pearl White Odyssey is peeling everywhere! The side doors, the hood and the top of the roof! I've never seen this before on Hondas that are way older than 10 years! I jumped on here to see if this was just my van or a pearl white issue…..so mad this is happening since these vans last forever minus the paint! I'm hoping Honda does something but it sounds like they aren't. Class action lawsuit should happen if they won't fix the problem since pearl white was the best color IMO. Everyday more paint chips away in chunks!
- Ba Yani on Mar. 14, 2024
  - I have the same situation, my 2014 Odyssey white paint suddenly is peeling off.

---

paint_anyone_else_have_this/; https://www.reddit.com/r/Acura/comments/11pvjfx/2014_mdx_white_pearl_paint_issue.

[15] *E.g.*, https://www.odyclub.com/threads/paint-peeling-on-my-2014 -odyssey.362519/?sortby=newest#replies





- CSHIRLEY on February 1, 2021
  - I have spoken with Honda Motor Corp and they refuse to do anything about the obvious paint defect for White Pearl. Has anyone considered joing [sic] to file a class action lawsuit to receive compensation? A local body shop quoted $1,000.00 to make the repairs to my car. The paint is coming off in chunks on the driver's side passenger door.

77. Honda Pilot owners have also made widespread reports of the Paint Defect on Piloteers.org, a popular Honda Pilot forum:[16]

[16] https://www.piloteers.org/threads/pilot-paint-peeling-class-action.178384/?sortby=newest#replies

- **Taliak on November 28, 2022**
  - I am so angry at Honda. My pilot 2012 Honda is peeling by chunks. I heard of a class action lawsuit that was settled in Quebec. Wondering if we know of any in regards to our pilots? Or if anyone is willing to start one here in Canada?
- **Frustrated on July 23, 2024**
  - I have a 2015 White Pilot, which I bought used in Dec 2017. My paint started coming off Oct/Nov of 2022. I went to Honda, who referred me to a collision center who TOLD ME that it was a known defect that the white pearl Hondas and Toyotas from this specific year - Honda would not cover it. The roof from my windshield to my sunroof is gone and now my hood is starting to peel. By the time it started peeling, my warranty had expired 4 months prior; A warranty I have no knowledge of. It's so frustrating.
- **Blaker on July 20, 2024**
  - I bought a used 2015 pilot, pearl white with 61k miles. It must have had some paint work and in a month the whole hood was pealing. tried to get support from honda. No such luck post 7 year extended warranty. $3k in painting later I am looking for some partial support.
- **Hermiehug on May 6, 2024**
  - 2013 model (White Diamond) and now seeing 2nd occurrence of paint peeling. Went back to look at service history, and see that I happened to report the first occurrence in May 2020 - exactly 3 months before the 7-yr extended warranty expired!! Talk about a stroke of luck! (At the time, the roof was repainted by Honda with no cost to me.)

    Based on all the previous posts, I guess I'm on my own with this 2nd occurrence? Or did someone have success with getting it addressed by Honda?

    Disclosure: I have not yet discussed the issue with Honda dealership. I thought I should come to Piloteers as first step, so that I can be well informed when I speak to Honda.

- **Jolenecmccall on March 3, 2024**
  - Same problem where do I go to file the suit! I purchased this 2014 Honda Pilot Touring $50,000 car new from the dealer. Took it there this weekend to show them the damage that appeared in January 2024. They said it is past their extended 7 year warranty. Shocked I haven't received anything about my car ever from them! It is clearly a supplier and their choice a manufacture problem. This car is immaculate and has been garage kept and hand washed always. The dealer sent me to their paint and body shop (waste of my day) and the repair to paint not just the roof but hood was beginning to show signs too was over $4,000 I will not pay this they need to. It is not fair to me to have this expense for just a 9 year old vehicle. It began peeling off like sign vinyl, pathetic. This is an expensive vehicle and amazed at Honda's lack of interest in wanting to keep their customers. Help where can I go file this class action law suit and is there one already started?




78. Owners and lessees of Honda Civics, CR-Vs, Fits, and HR-Vs also note the widespread existence of the Paint Defect on their vehicles on Reddit.com, among other online sources:[17]

- **Wooden-Hour7167 in or about September 2025**
  - 2015 Honda civic touring. The paint peeling on the roof continues to

[17] https://www.reddit.com/r/hondafit/comments/15gl28z/2019_honda_fit_paint_peeling/; https://www.reddit.com/r/HRV/comments/182753x/honda_refusing_to_cover_2016_paint_peeling/; https://www.reddit.com/r/Honda/comments/1no3an2/2015_white_honda_civic_paint_peeling_how_screwed/; https://www.reddit.com/r/Detailing/comments/179ztab/peeling_paint_2016_honda_crv/.

get worse. I live in an apartment, what are my options for fixing it so it doesn't rust out and looks half decent. Thoughts?



- **Philosophizee in or about April 2023**
  - My fiance has a white honda crv and the paint is peeling off in handsized chunks exposing the primer underneath. We have tried going through the manufacturer who had issued an extended warranty on the paint because a lot of their white cars were having the same issue, but she missed the deadline by about 4 months.
- **Kittymatcha in or about October 2023**
  - 2019 Honda fit paint peeling. Of course my car is not included in the paint repair warranty for other Honda fits of prior years. Anyone else having the same issue with their Honda fit? I bought mine in October 2019.



- **Jimmycheapseaweek on May 6, 2024**
  - My 2019 Fit did the exact same thing…and it's white as well. Honda

won't fix this even though it's so obvious their white paint is [expletive]. The only way they might consider paying for the repair is if you are someone who always takes your Honda to the dealer for all your regular service or if you know someone at Honda corporate to pull some strings for you.

- **Urbanglowcam in or about October 2023**
  - Honda refusing to cover 2016 paint peeling The paint on my 2016 orchid pearl is clearly flaking off. Honda isn't honoring the extended warranty since I am a little outside of the 7 year extension. Anyone experience something similar or have advice?



- **Vt8919 in or about October 2023**
  - My 2016 had its roof repainted a year ago under warranty. The funny thing is that Honda paid a Chrysler dealership to do it since it was the closest paint shop in my area that met their standards.
    There's also flaking in the gap where the front fenders and the hood meet, and on the rear spoiler in the gap between it and the roof. But those areas have been manageable and haven't gotten worse in years.
    White water based paint has a hard time bonding to the primer so it's a problem amongst multiple brands. Honda, Toyota, Hyundai, Kia, Ford and GM seem to have the worst issues.

79. In 2019, Honda could no longer feign ignorance and acknowledged the Paint Defect, issuing various TSBs for some of the impacted make/models/model years/and paint colors, providing an (inadequate) extended warranty to repair or compensate owners and lessees of Class Vehicles experiencing the Paint Defect.

80. For instance, TSB 19-029, "Warranty Extension: White Diamond Pearl Paint," issued by Honda on June 1, 2019, states in part:

> This warranty extension only applies to 2014-16 MDX vehicles that are painted NH-603 White Diamond Pearl.
>
> The exterior paint on the roof and/or tailgate may peel off. American Honda is extending the warranty on the paint of the affected vehicles to 8 years from the original date of purchase with no mileage limit.
>
> ***
>
> This warranty extension only applies to the panels listed in the WARRANTY CLAIM INFORMATION section if they exhibit a paint peeling problem. All paint repairs MUST have DPSM approval before starting work.
>
> ***
>
> **CORRECTIVE ACTION**
> **Inspect the vehicle and, if necessary, have a ProFirst Certified Body Shop repaint the entire affected panel(s) with a tri-coat color, mid (mica) , and clear coat paint after obtaining DPSM approval.**[18]
>
> ***
>
> 3. Inspect the roof and tailgate areas for damage
>
> If the paint on the vehicle appears similar to the images below, go to REPAIR PROCEDURE.[19]

---

[18] https://static.nhtsa.gov/odi/tsbs/2019/MC-10161250-0001.pdf (emphasis in original)

[19] On or about August 29, 2019, Honda superseded TSB 19-029 to cover only outsourced work to third-parties, stating: "As of August 29, 2019, only sublet claims will be accepted. Prior flat rate-based warranty claims will no longer be accepted." https://static.nhtsa.gov/odi/tsbs/2019/MC-10164472-0001.pdf (emphasis in original).

MDX:



81. TSB 19-055, "Warranty Extension: Taffeta White Paint," issued by Honda on August 29, 2019, applied to 2013 Honda Odysseys and 2014-2015 Honda Pilots, provided an extended warranty for seven years from the original date of purchase with no mileage limit, and stated regarding the covered Honda Odysseys and Pilots that "[t]he exterior paint on the roof and/or tailgate may peel off."[20]

82. TSB 19-064, "Warranty Extension: NH-788 White Orchid Pearl or Bellanova White Paint" issued by Honda on August 29, 2019, applied to 2015-2017 Honda Fits and 2016-2018 Honda HR-Vs, provided an extended warranty for seven years from the original date of purchase with no mileage limit, and stated that "[t]he exterior paint on the vehicle may peel off."

83. In TSB 19-029, TSB 19-055, and TSB 19-064, Honda stated that "[o]wners of affected vehicles will be sent a notification of this [warranty extension] campaign." Despite this promise, Honda did not send notice to a substantial portion of Class members who owned or leased covered Class Vehicle makes and models, including Plaintiffs.

**D. Honda Knew of the Paint Defect before It Sold Class Vehicles to Plaintiffs**

84. Honda knew about the Paint Defect before it sold or leased Class Vehicles with the Paint Defect to Plaintiff Attika in 2019; Plaintiff Beaton in 2023; the Biven Plaintiffs in 2020; the Bowerman Plaintiffs in 2015; Plaintiff Galbraith in 2018;

---

[20] https://static.nhtsa.gov/odi/tsbs/2019/MC-10164449-0001.pdf.

Plaintiff Gimenez-Picou in 2019; Plaintiff Hrabovsky in 2024; the Novack Plaintiffs in 2017; Plaintiff Parvin in 2018; Plaintiff Radigan in 2017; Plaintiff Taylor in 2015; Plaintiff Torres in late 2016; Plaintiff Yang in 2014; and all Class members during the relevant period (late 2012 to the present), based on: (i) internal paint testing; (ii) prior TSBs from Honda involving substantially similar paint issues; (iii) consumer reports of the Paint Defect; and (iv) a prior settled Canadian class action lawsuit directly addressing the a substantially similar paint issue as the Paint Defect at issue in this case.

85. Despite its superior and exclusive knowledge (as detailed below), Honda did not disclose the Paint Defect, actively concealed the Paint Defect from Plaintiffs and the Class, and made incomplete, misleading representations to Plaintiffs and the Class regarding the Class Vehicles' paint, value, and durability.

**i. *Internal Testing***

86. Prior to a new paint and/or paint system being used on a vehicle (such as the epoxy clear coat system used by Honda, for instance), automakers such as Honda employ multiple standards and test protocols to ensure long life and film integrity of the paint system as well as the underlying substrate. In addition to extensive exterior and accelerated weathering evaluation of clearcoats, there is additional aggressive testing prior to the qualification of an automotive coating system to ensure the paint system will provide long lasting protection when exposed to environmental elements. These tests often run over the course of two-to-five years before a vehicle using the paint system is brought to market.

87. Most of these test procedures are developed and standardized by the American Society for Testing and Materials ("ASTM") and the Society of Automotive Engineers ("SAE"), and typically include:

a. accelerated weathering tests to assess paint color, gloss retention, and appearance in general, such as Xenon Arc (subjecting test panels to intense radiation), QUV (subjecting test panels to high ultra-violet light and condensing humidity cycles), EMMAQUA (placing test panels on racks that rotate with the sun to provide maximum UV light

exposure), and humidity tests (subjecting test panels to 100% relative humidity at 100°F for several weeks);

b. long-term outdoor weathering tests, where test panels are placed on so called "test fences" at 45-degrees facing south (according to ASTM1 standards) in various environments, such as Florida (high UV light, humidity, and salt spray), Arizona (intense UV light and temperature), and industrial sites (high pollutants such as acid rain and various chemicals);

c. corrosion resistance tests, including salt spray (subjecting test panels to 5 wt. salt spray at 95°F for several weeks), cyclic corrosion (subjecting test panels to various cycles of salt spray, humidity, wet/dry, temperature), condensing humidity (subjecting test panels to temperature cycling in highly saturated air, CASS (subjecting test panels to salt spray with added acetic acid for accelerated testing), and Kesternich (subjecting test panels to acid rain simulation);

d. physical and mechanical tests, including flexibility, impact resistance abrasion resistance, scratch and mar resistance, coating thickness, adhesion, and hot and cold cycling; and chemical properties testing, including resistance to solvents, chemicals and various fluids the vehicle will likely encounter in the open environment.

88. Furthermore, Honda is member of the Automotive Industry Action Group ("AIAG"), which has a common Production Part Approval Process ("PPAP"). According to prevailing automotive industry standards during the relevant period (late 2012 to the present), it was and is standard practice to undertake a PPAP when making changes to an existing automotive design, including a change in paint and the process of applying the paint to a vehicle.

89. The Automotive Industry Action Group, of which Honda is a member, has developed a common PPAP standard for suppliers of automotive paint. The PPAP is a standardized, required process in the automotive industry that helps manufacturers and suppliers communicate and approve production designs and processes before, during, and after manufacture.

90. The PPAP is designed to demonstrate that a supplier has developed its

design and production process to meet the client's requirements, minimizing the risk of failure by effective use of advanced planning. Requests for approval must be supported in official PPAP format and with documented results when needed.

91. The purpose of any PPAP is to: (a) ensure that a supplier can meet the manufacturability and quality requirements of the parts supplied to the customer; (b) provide evidence that the customer engineering design record and specifications are clearly understood and fulfilled by the supplier; and (c) demonstrate that the established manufacturing process has the potential to produce the part that consistently meets all requirements during the actual production run at the quoted production.

92. Typically, there are numerous PPAP requirements, including for material performance, which includes paint performance. On information and belief, Honda would have required its suppliers to test the paint, and its application, to see how it performed in simulated real-world conditions to determine the quality and durability of the paint, whether the paint adhered to the surface of the vehicle, whether it corroded or delaminated, how it performed when subjected to heat, cold, light, moisture, and rain, whether the color or gloss faded, changed, or was retained, among other performance metrics.

93. Thus, either as part of the PPAP or independent of it, Honda performed several of the above-described ASTM and SAE test procedures. In fact, Honda has developed what is referred to as "Honda SAE Standards & Testing" that are used in connection with the testing of its vehicles, including D2023-07 Rev.4 "Heat-Resistant Coating," HES D6501-06 "General Test Methods for Coatings," HES D2021-04 "Corrosion Proof Coating (on metals)," and 5100Z-S04-0000 "Painting Quality of Automobile Suspension Arc Welded Parts," as well as various other tests relating to the performance of the paint used on its vehicles, including the Class Vehicles, in simulated real-world conditions.

94. The development of the paint and the paint manufacturing process in this case, including the testing performed in connection therewith, would have revealed the

Paint Defect. However, the details regarding the testing performed by Honda and the results of that testing are in the exclusive custody and control of Honda.

95. Moreover, prior to Class Vehicle distribution, Honda would have conducted factory audits and quality control checks that would have identified irregularities in paint thickness, adherence, which would have made Honda aware of a substantially heightened risk of future peeling.

**ii. *TSBs 19-029, 19-055, and 19-064 and Substantially Similar Prior TSBs***

96. Honda's pre-sale knowledge of the Paint Defect is evidenced by TSBs 19-029, 19-055, and 19-064 addressing the Paint Defect impacting the Class Vehicle. The detailed repair procedure contained in those TSBs—which involves removing the paint and the e-coat if damaged and reapplying the paint—indicates Honda's familiarity with the Paint Defect, its cause, and solution.

97. Honda's familiarity with the Paint Defect and the proper repair procedure stems from its extensive pre-sale experience with substantially similar paint defects and resulting TSBs in other Honda-manufactured vehicles.

98. Most notably, in May 2008, prior to the start of the sale of the Class Vehicles in this case, Honda issued TSB 08-031, "Warranty Extension: Paint Peeling on Dark Blue 2003-2005 Odysseys," where Honda described a substantially similar paint peeling issue and stated: "[o]n potentially affected vehicles, the exterior paint may peel off the horizontal (flat) surfaces and in recessed areas around the glass or the sliding doors[,]" including—much like this case—the "[roof] including under the top edge of the tailgate, under the top edge of the sliding glass doors, and the top of the panel of the sliding doors."

99. In TSB 08-031, Honda provided the following pictures of the relevant damage and described a similar repair procedure as set forth in TSB 19-029 (removal of the paint and/or e-coat and repainting):




100. The Honda Odyssey model years covered by TBS 08-031, like most of the Class Vehicles involved in this case, were painted in Honda's Alabama automobile factory, using a substantially similar defective type of paint and/or substantially similar defective manufacturing process and suffered a substantially similar paint defect as the Class Vehicles here. As a result, Honda fully understood the nature and causes of the Paint Defect from its experiences relating to TSB 08-031 prior to selling the Class Vehicles involved in this case. Honda attempted to ameliorate the paint peeling issue necessitating TSB 08-031 but understood, prior to vehicle sales to Plaintiffs and the

Class, that it did not fully remedy the issue in the Class Vehicles.

101. Likewise, between August 2012 and September 2014, the beginning of the relevant timeframe and a time well-before Plaintiffs' Class Vehicle leases and purchases (late 2013, late 2017, 2019, and 2020), Honda issued TSBs 12-049, 13-060, and 14-034 addressing "Honda Civic Hood Paint Cracking" and "Civic Roof and Trunk Paint Chalking and Clouding" in 2006-2013 Honda Civics.

102. TSBs 12-049, 13-060, and 14-034 involved the following pearl and metallic paint colors, which—upon information and belief—were applied by Honda during manufacturing using a three-stage paint process:

- B-92P – Nighthawk Black Pearl
- B-529P – Fiji Blue Pearl
- B-536P – Royal Blue Pearl
- B-537M – Atomic Blue Metallic
- • B-561P – Dyno Blue Pearl
- • NH-701M – Galaxy Gray Metallic
- • NH-731P – Crystal Black Pearl
- • NH-737M – Polished Metal Metallic
- • YR-578M – Urban Titanium Metallic
- • B-586P – Dyno Blue Pearl II (2012 model only)

103. Based on its experiences with issues with three-stage paints and paint layer adhesion issues in 2006-2013 Honda Civics, Honda would have been well-aware of the paint defects and/or defective paint processes that lead to poor paint adhesion much like the Paint Defect plaguing the Class Vehicles in this case, particularly considering the paint peeling and delaminating issues cited by Honda impacting 2003-2005 Honda Odysseys as described in TSB 08-031. Nevertheless, Honda used similarly defective paints and similar processes to manufacture the Class Vehicles, resulting in the Paint Defect at issue here.

### iii. *Customer Complaints Directly to Honda and Online Sources Honda Monitored*

104. Honda also knew or should have known about the Paint Defect because numerous consumer complaints regarding Paint Defect were made directly to Honda or on online sources monitored by Honda. The large number of complaints, and the consistency of their descriptions of the Paint Defect alerted, or should have alerted, Honda that the Paint Defect existed and exclusively affected the Class Vehicles.

105. The full universe of complaints made directly to Honda about the Paint Defect is information presently in the exclusive custody and control of Honda and is not yet available to Plaintiffs prior to discovery. However, as set forth above, many Class Vehicles owners complained directly to Honda and Honda authorized dealerships about the Paint Defect.

106. Many of these complaints occurred at the beginning of the relevant timeframe and a time well-before Plaintiffs' Class Vehicle leases and purchases. For example, in the "nelci" post described above, the owner states that he informed Honda of the Paint Defect in the 2014 Acura MDX in White Diamond Pearl and sought a repair for the defect at least as early as October 2013.

107. The "nelci" post is not an isolated report of the Paint Defect in the early relevant timeframe. For instance, on CarComplaints.com, users widely describe informing Honda of the Paint Defect in Class Vehicles, as well as substantially similar paint problems in related Honda models, between 2010 to 2013.

- **Warren L; September 25, 2010; 2009 Honda Odyssey EX-L 3.5**
  - Well we just purchased the Van in July. I notice some small light cracks on bumper. I never really paid attention to it. Now few months later after a few car washes the clear coat is peeling off all over even above the headlights. Clearly a defect in the paint and clear coat. Dealer said they need to take pictures and send it in to Honda to get this fixed. Still no luck. Dealer ask if I hit something or got in a wreck? What a dumb question when the clearcoat is peeling above lights and on sides of front grill. If I was in a wreck the lights would be gone. Anyway

most of the clearcoat is peeled off and winter is now taking its toll on the front end. Will let you know the results. So much for a High Priced Van. :([21]

- **Kelly S., October 6, 2011; Honda Pilot ES-RES[22]**
  - My new honda pilot has been in the shop 3 different times for paint issues. Now I just found another spot that is chipping.

- **Lindsey T; December 28, 2012; 2009 Honda Odyssey Touring**

  - There was a paint peeling next to the moon roof when the vehicle was purchased. The dealer fixed this at no charge. Now there are 2 other spots peeling down to metal, on each side of the vehicle just above the door on the frame. First started on the passenger side about a year ago, and just last week started on the driver side. Clearly this is not an area of "normal wear and tear", and an issue with the paint.

    For the price and year of the vehicle, this is not acceptable. I take good care of my vehicles and am very disgusted with the way the peeling paint makes my vehicle look. Not to mention what it says about Honda, whose vehicles I love and own 2 of! Of course, there is nothing being done about it.[23]

- **Balaji B.; Nov. 1, 2013;2011 Odyssey LX[24]**
  - I purchased a 2011 White Honda Odyssey from a small time dealer on Nov 2012. I observed that the roof of the car had its paint peeling off after about a year 2013 Nov. I went to a reputed dealer, who acknowledged the paint issues with Honda but told that 2011 models are not one of those. He contacted Honda and came back with an offer of $400 to cover the paint issues. But that would no way cut it and I feel cheated and ripped to have bought a Honda. Will never by [sic] a

---

[21] https://www.carcomplaints.com/Honda/Odyssey/2009/body_paint/clearcoat_peeling.shtml.

[22] https://www.carcomplaints.com/Honda/Pilot/2011/body_paint/paint_chipping_easily.shtml.

[23] https://www.carcomplaints.com/Honda/Odyssey/2009/body_paint/paint_peeling-2.shtml.

[24] https://www.carcomplaints.com/Honda/Odyssey/2011/body_paint/peeling_paint_on_roof.shtml.

Honda again

108. To be sure, Honda was aware of the Paint Defect prior to Plaintiffs' and Class members' purchases based on prior internal testing and prior TSBs. Early reports of the Paint Defect, and substantially similar paint issues in earlier makes and models of the Class Vehicles, only confirmed what Honda already knew about the latent paint defect by the beginning of the relevant time (late 2012).

109. As the relevant time progressed, Honda no doubt increasingly received or was aware of complaints made directly to Honda or its authorized dealers or on websites closely monitored by Honda. By the time Plaintiffs purchased their Class Vehicles (late 2013 through 2020), Honda received hundreds if not thousands of complaints of the Paint Defect affecting the Class Vehicles.

**iv. *Canadian Class Action Lawsuit***

110. Honda also knew or should have known about the Paint Defect because of complaints of substantially similar paint issues impacting Canadian Honda vehicles, complaints ultimately resulting in a class action lawsuit being filed against Honda Canada, Inc. in Quebec, Canada Superior Court on May 4, 2018, *Stéphanie Daunais v. Honda Canada Inc.*, No. 500-06-000927-182.

111. The Canadian class action was brought on behalf of all persons who purchased or leased a Honda Civic, Accord, CR-V, Odyssey, or Pilot whose paint experienced peeling (delamination). Among other things, the Canadian class action against Honda alleged a "phenomenon" of paint peeling affecting Honda vehicles throughout North America.

112. In April 2022, the plaintiffs in the Canadian case and Honda Canada, Inc. settled the lawsuit on a class-wide basis. The settlement, approved in May 2022, allowed eligible claimants to receive compensation for costs associated with repainting due to peeling or delaminating paint, including:

- Reimbursement of up to CAD $2,550 for repainting the vehicle.
- Cash compensation of up to CAD $1,530 if they choose not to repaint.
- Compensation for previously completed repainting work.

- Reimbursement if they experienced a loss in resale value due to the paint issues.

The claims period began in September 2022 and extended until March 31, 2023, with up to $27 million available for eligible claims.

113. Despite its various sources of pre-sale knowledge of the Paint Defect, Honda and its authorized dealers marketed the Class Vehicles to Plaintiffs for premium prices based on purported durability, high value, and ability retain value even though it knew that the Paint Defect would severely impact those attributes for the Class Vehicles during their reasonably expected life.

114. Moreover, despite its pre-sale knowledge of the Paint Defect prior to Plaintiffs' and Class members' purchases of the Class Vehicles, Honda and its authorized dealers never disclosed the latent Paint Defect to Class Members prior or during their purchases of the Class Vehicles, despite a duty to do so.

**E. Honda Had a Duty to Disclose the Paint Defect Before It Sold Class Vehicles to Plaintiffs and Members of the Classes, Including Disclosure Through Its Authorized Dealers**

115. From at least the beginning of the relevant time (late 2012 to the present), Honda and its authorized dealers had a duty to disclose to consumers, including Plaintiffs and members of the Classes, that the Class Vehicles had a latent Paint Defect which caused their white paint to prematurely fail, bubble, peel, delaminate, and flake during the reasonably expected life of the Class Vehicle.

116. During the relevant time, Honda possessed exclusive and superior knowledge, not discoverable by Plaintiffs (including through reasonable inspection), regarding the Paint Defect, garnered through internal testing; prior substantially similar paint defects and TSBs; widespread consumer reports directly to Honda and its authorized dealers and online sources closely monitored by Honda; and at least one substantially similar lawsuit. Therefore, Honda had a duty to disclose its exclusive and superior knowledge of the Paint Defect but did not disclose that information to wrongly protect its business and bottom line.

117. During the relevant time, including when each Plaintiff purchased their Class Vehicle, Honda made incomplete and false representations that required a corrective and complete disclosure regarding the Paint Defect, and the sources of pre-sale knowledge that revealed the Paint Defect to Honda. Among other things, Honda, represented in Product brochures, press releases, and other sources that the Class Vehicles were high-value, stylish, luxurious, and durable, and would retain their value far better than competitor vehicles. Honda's authorized dealers and authorized dealer sales representatives also made voluntary and incomplete disclosures regarding the Class Vehicles' paint, value, and durability when Plaintiffs and members of the Classes were purchasing their Vehicles.

118. However, Honda, and Honda's authorized dealers failed to disclose that the latent Paint Defect was a virtual inevitability that would destroy the Class Vehicle's aesthetics and substantially impact the Class Vehicles' central transportation function and safety, factors which would negatively and substantially impact the Class Vehicles' value, resale potential, and could result in costly repairs which would very likely fail to resolve the Paint Defect or restore the Class Vehicles to their bargained-for value.

119. Moreover, during the relevant timeframe, including when each Plaintiff purchased their Class Vehicle, Honda actively concealed consumer reports of the Paint defect. Honda knew that if it disclosed that the Class Vehicles suffered from the latent Paint Defect, Plaintiffs and Classes members would not have purchased the Class Vehicles or would have paid far less for the Class Vehicles. To selfishly protect its business and bottom-line, Honda concealed the Paint defect in sales materials, television advertising, and other promotional channels.

120. Honda's misrepresentations and omissions were material because, when purchasing cars, Plaintiffs, Class members, and other reasonable consumers were very concerned with the paint color; vehicle aesthetics, style, luxury, and design; durability and resale value; and the potential need for repairs. Plaintiffs, Class members, and other reasonable consumers would not expect the Paint Defect to arise during the reasonably

expected useful life of the Class Vehicles.

121. Moreover, to the extent required under applicable law, Honda had a duty to disclose the Paint Defect based on central functionality and safety reasons.

122. The quality of a vehicle's exterior paint is integral to a vehicle's central transportation function, as well as a vehicle's safety, efficiency, and reliability, by acting as a necessary barrier that prevents rust and corrosion.

123. A vehicle must maintain its chassis strength and body integrity to operate safely. Rust and corrosion weaken the frame, window and windshield connections, the undercarriage, or the suspension mounting points, increasing the risk of structural failure, especially in a crash or under a load.

124. Paint is not purely cosmetic—it serves a protective function by sealing metal and other integral vehicle components from moisture, salt, and environmental exposure. Defective paint that peels prematurely can expose metal and other central vehicle components, accelerating rust, corrosion, and other damage, which negatively impacts a vehicle's central transportation function, efficiency, and reliability, and increasing safety risks.

125. In this case, the Paint Defect rapidly and extensively causes paint peeling, delaminating, bubbling, and flaking, exposing large and integral portions of the Class Vehicles to moisture, salt, and environmental exposure. In turn, the Paint Defect causes corrosion and rusting of the Class Vehicles' frame—including the windshield frame and tailgate frame—and exposes and degrades the urethane adhesive bonding the windshield, the sunroof, and rear windshield. This type of damage substantially increases the chance of leaking, windshield failure under normal driving conditions, and the risk of the windshield popping out during a crash or rollover, renders transportation unsafe, and impairs the Class Vehicles' central transportation function, efficiency, and reliability.

126. Honda's authorized dealers are Honda's agents, and Honda is thus liable for its authorized dealers' acts and omissions, including its authorized dealers' failure to

disclose the Paint Defect to Plaintiffs and Class members during purchase and when inadequately repairing Class Vehicles.

127. Honda's agency relationship with its authorized dealers is demonstrated by the following circumstances (without limitation):

- Honda requires authorized dealers to follow Honda's rules and policies in conducting all aspects of dealership business and for Honda's benefit, including the delivery of Honda's warranties to consumers, and the servicing of defective vehicles, including servicing and repairing the Paint Defect.
- Honda's authorized dealers conduct repairs and service on Class Vehicles according to Honda's instructions, which Honda issues to its authorized dealerships through service manuals, technical TSBs, technical tips, and other documents.
- Honda specifically instructed and required its authorized dealers to repair the Paint Defect here under the limited and inadequate circumstances set forth in TSB 19-029, TSB 19-055, and TSB 19-064, according to Honda's specific instructions and only with Honda's prior approval.
- Service and repairs for vehicles covered under Honda's warranties are only available at Honda 's authorized dealerships, with Honda having control over the actions of the authorized dealerships regarding service and repairs.
- Honda's warranties to consumers direct consumers to take their vehicles to authorized dealerships for repairs and services.
- Honda controls the way in which its authorized dealers can respond to complaints and inquiries concerning defective vehicles, including the Paint Defect at issue.
- Honda's warranties instruct consumers to direct concerns or issues about their Honda/Acura vehicles to a dealership, but if the dealership does not address the concern to the consumer's satisfaction, then the warranties instruct consumers to call the Honda/Acura Customer relations which would then

assist the consumer in working with the dealership to resolve the concern.

- Honda's authorized dealers have agreed to, and authorized Honda to, exercise substantial control over authorized dealer operations and authorized dealers' interaction with the public.
- Honda developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional materials for the Class Vehicles through its authorized dealers, and Honda is responsible for the content of Monroney stickers (a type of label required by federal law to be affixed on every new passenger car and light-duty truck sold in the United States) on Honda and Acura-vehicles.

128. Honda also has day-to-day operational control of its authorized dealers including:

- Requiring authorized dealers to promote and sell, at retail, Honda vehicles and to render service on Honda vehicles;
- The right to provide sales personnel and other Honda personnel to authorized dealers and to provide required training and instruction to authorized dealerships.
- Control over the training of authorized dealers' sales representatives, including requiring authorized dealer personnel to attend specialized training courses.
- The right to control, provide, establish, and maintain advertising programs for authorized dealers and the right to control and require authorized dealers to cooperate with all reasonable promotional programs developed by Honda;
- The right to review and require authorized dealers to submit to Honda for performance review of the authorized dealers' sales obligations;
- Requiring authorized dealers to investigate and resolve satisfactorily all consumer complaints and to refer consumer complaints to Honda where the complaints cannot be resolved satisfactorily;

- Requiring authorized dealerships to follow all reasonable directives, suggestions, and policies of Honda.
- Controlling authorized dealers' ability to maintain certain levels of minimum net working capital, owner's equity, flooring, or lines of credit to be used in dealership operations.
- Controlling the way authorized dealerships maintain uniform accounting systems and practices and accounting and other data collection.
- Controlling and requiring authorized dealerships to furnish monthly statements and data to Honda, on forms and using systems prescribed by Honda, including a complete and accurate financial and operating statement covering the preceding month and calendar-year-to-date operations.
- Controlling and requiring authorized dealerships to permit Honda to examine, audit, reproduce and take copies, of all reports, accounts and records pertaining to the sale, servicing, and inventorying of Honda vehicles.
- Controlling litigation against authorized dealers, including defending and indemnifying authorized dealers against any money judgment for lawsuits relating to Honda's misconduct and providing Honda with the discretionary authority to defend lawsuits involving dealer misconduct.
- The right to terminate Honda's relationship with the authorized dealer at Honda's will with ninety (90) days' notice.

129. Based on the foregoing, Honda acts through its authorized dealers and has manifested consent to its authorized dealers that the authorized dealers should act on Honda's behalf and subject to Honda's control. In turn, Honda's authorized dealers have consented to act on Honda's behalf and subject to Honda's control, and Honda's authorized dealers represent themselves to the public as Honda's representatives and agents at all relevant times.

### F. Plaintiffs' Class Vehicle Purchases and Paint Defect Experiences

#### *1. Plaintiff Attika*

130. Plaintiff Quinn Attika is a resident of West Palm Beach, Florida and is a citizen of Florida. In April 2019, Ms. Attika purchased a new 2019 Honda Fit in White Platinum Pearl paint from Honda of Roanoke Rapids, an authorized Honda dealer located at 403 Premier Blvd., Roanoke Rapids, North Carolina 27870. Ms. Attika paid $22,241.00 to purchase the Class Vehicle.

131. Prior to purchasing the Class Vehicle, Ms. Attika viewed marketing materials that touted the quality, durability, and value of Honda's vehicles, including the Class Vehicle. The sales representative and/or other personnel at Honda of Roanoke Rapids emphasized the quality, durability, and aesthetic features of the Class Vehicle.

132. Ms. Attika relied on the information regarding the quality, durability, and value of the Class Vehicle conveyed in those marketing materials, as well as by the sales representative and/or other personnel, in deciding to purchase her Class Vehicle. When Ms. Attika spoke with the Honda sales representative, she was told that the car she wanted "was available either in white or blue." The cars were the same except for the color. She chose white. The availability of the Honda Fit in White Platinum Pearl was a material factor in her decision to purchase her Class Vehicle.

133. Honda failed to disclose the Paint Defect to consumers, including Ms. Attika and other members of the Class, and Ms. Attika, therefore, purchased her Class Vehicle on the reasonable, but mistaken, belief that the Class Vehicle's paint was defect free and the Class Vehicle would be a quality and durable vehicle that would retain its value. Ms. Attika would not have purchased the Class Vehicle, or would not have paid as much for it, had Honda disclosed the Paint Defect and the propensity of the white paint to bubble, peel, delaminate and flake off the Class Vehicle. She either would not have bought the vehicle for the price she paid, or she would have purchased the blue car.

134. In or about April 2024, Ms. Attika noticed for the first time that her Honda

Fit's paint was failing, bubbling, peeling, delaminating and/or flaking on the hood of the car and on the roof of the car, two of the most common areas for the Paint Defect to arise on the Class Vehicles (something Honda acknowledged in its 2019 TSBs). The following picture on the left shows the peeling paint (and subsequent rust) on the roof of the car The picture on the right shows the peeling on the hood of the car.:





135. Ms. Attika properly maintained her Class Vehicle at all times. As a result, the peeling paint on her Class Vehicle's hood and roof cannot be the result of any other factor except the Paint Defect.

136. The peeling paint on the roof started small and got progressively worse.

137. After her vehicle started to peel, Ms. Attika brought her car for service to Ed Morse Honda in Riviera Beach, Florida. That authorized Honda dealer is located at 3790 West Heron Boulevard, Riviera Beach, Florida. When she spoke to the Honda service representative about an oil change and other items, she asked him to look at the

peeling paint on the car. He examined the peeling paint and acknowledged that white Hondas had a peeling paint problem.

138. When she asked him, on behalf of Honda, whether Honda would repair the damage, he discussed it with a manager, who offered to sell Ms. Attika another Honda. Ms. Attika said she was not interested in buying a new Honda. Instead, she wanted to have Honda repair the Paint Defect on her car. Honda refused.

139. When Ms. Attika could not get Honda and the representatives at Ed Morse Honda to repair her car, she contacted Honda Customer Relations to again report the peeling paint problem and seek relief. In response, Honda denied her request to fix the car and instead had a salesperson call Plaintiff, offering to sell her another Honda vehicle.

140. After various communications with Honda seeking to have Honda repair or pay to repair the Paint Defect, and after repeated demands from Ms. Attika, Honda asserted that the repair was not covered by Honda's warranties and it refused to repair the Paint Defect or pay to repair the Paint Defect.

141. Ms. Attika has not yet repaired the Paint Defect (to the extent it can be repaired), but, upon information and belief, expects that re-painting the car and repairing the Paint Defect would cost thousands of dollars.

142. Ms. Attika has suffered a concrete and ascertainable loss as a direct and proximate result of Honda's misconduct in that Ms. Attika overpaid for her Class Vehicle at the time of purchase, the value of her Class Vehicle has been diminished as a result of the Paint Defect, and she will have to pay out-of-pocket to repair a latent Paint Defect Honda was well aware of at the time of sale.

***2. <u>Plaintiff Amy Beaton</u>***

143. Plaintiff Amy Beaton is a resident of Racine, Wisconsin and is a citizen of Wisconsin. In November 2023, Ms. Beaton purchased a Certified Pre-Owned ("CPO") 2020 Honda Pilot in Platinum White Pearl paint from Honda City, an authorized Honda dealer located at 3450 S 108th St, Milwaukee, Wisconsin 53227.

Ms. Beaton paid $27,181 to purchase the Class Vehicle.

144. Prior to purchasing the Class Vehicle, Ms. Beaton viewed marketing materials that touted the quality, durability, and value of Honda's vehicles, including the Class Vehicle.

145. In addition, during sales discussions, Honda's authorized dealer at Honda City emphasized the quality, durability, and aesthetic features of the Class Vehicle and specifically disclosed that the Class Vehicle was available to purchase in white without disclosing the existence of the Paint Defect.

146. Ms. Beaton relied on Honda's omissions and on the information regarding the quality, durability, and value of the Class Vehicle conveyed in those marketing materials, as well as by the sales representative and/or other personnel, in deciding to purchase her Class Vehicle. Moreover, Ms. Beaton specifically wanted to purchase a vehicle in a white color, and the availability of the Honda Pilot in Platinum White Pearl was a material factor in her decision to purchase her Class Vehicle.

147. Honda failed to disclose the Paint Defect to consumers, including Ms. Beaton and other members of the Class, and Ms. Beaton, therefore, purchased her Class Vehicle on the reasonable, but mistaken, belief that the Class Vehicle's paint was defect free and the Class Vehicle would be a quality and durable vehicle that would retain its value. Ms. Beaton would not have purchased the Class Vehicle, or would not have paid as much for it, had she known of the Paint Defect and the propensity of the white paint to bubble, peel, delaminate and flake off the Class Vehicle.

148. In late 2025, Ms. Beaton noticed for the first time that her Honda Pilot's paint was failing, bubbling, peeling, delaminating and/or flaking on her Class Vehicle's roof and on the tailgate, two of the most common locations for the Paint Defect to manifest (something Honda acknowledged in its 2019 TSBs), as shown in the following pictures:





149. Ms. Beaton properly maintained her Class Vehicle, and the paint problem throughout her Class Vehicle cannot be the result of any other factor except the Paint Defect.

150. In late 2025, Ms. Beaton contacted Honda City to report the Paint Defect and seek a repair, speaking to Travis Hoffman, a Honda sales representative. Honda City refused Ms. Beaton's demand that it repair or pay to repair Ms. Beaton's Honda Pilot.

151. In or about December 2025, Ms. Beaton also contacted Honda Customer Relations demanding Honda repair or pay to repair the Paint Defect. Honda Customer Relations also refused Ms. Beaton's demand to repair or to pay to repair Ms. Beaton's Honda Pilot.

152. Ms. Beaton has not yet paid out-of-pocket to have her Class Vehicle repainted, and the paint peeling continues to spread and worsen.

153. Ms. Beaton has suffered a concrete and ascertainable loss as a direct and proximate result of Honda's misconduct in that Beaton overpaid for her Class Vehicle at the time of purchase, the value of her Class Vehicle has been diminished as a result of the Paint Defect, and she will have to out-of-pocket costs to repair a latent Paint

Defect Honda was well aware of at the time of sale.

***3. Plaintiffs Morgan and Stephen Biven***

154. Plaintiffs Morgan and Stephen Biven are residents of Louisville, Kentucky and are citizens of Kentucky. In 2020, the Bivens purchased a Certified Pre-Owned 2018 Honda HR-V in White Orchid Pearl paint from Honda World, 1 Auto Center Drive, Louisville, KY 40299, an authorized Honda dealer. The Bivens paid approximately $20,500 to purchase the Class Vehicle.

155. Prior to purchasing the Class Vehicle, the Bivens viewed marketing materials that touted the quality, durability, and value of Honda's vehicles, including the Class Vehicle.

156. During sales discussions, Honda's authorized dealer at Honda World emphasized the quality, durability, and aesthetic features of the Class Vehicle and specifically disclosed that the Class Vehicle was available to purchase in white without disclosing the existence of the Paint Defect.

157. The Bivens relied on the information regarding the quality, durability, and value of the Class Vehicle conveyed in those marketing materials, as well as by the sales representative and/or other personnel, in deciding to purchase their Class Vehicle. The availability of the Honda HR-V in White Orchid Pearl was a material factor in their decision to purchase his Class Vehicle.

158. Honda failed to disclose the Paint Defect to consumers, including the Bivens and other members of the Class, and the Bivens, therefore, purchased their Class Vehicle on the reasonable, but mistaken, belief that the Class Vehicle's paint was defect free and the Class Vehicle would be a quality and durable vehicle that would retain its value. The Bivens would not have purchased the Class Vehicle, or would not have paid as much for it, had Honda disclosed the Paint Defect and the propensity of the white paint to bubble, peel, delaminate and flake off the Class Vehicle. They either would not have bought the vehicle for the price they paid, or they would have purchased the Class Vehicle in a different color.

159. Honda did not send notification to the Biven Plaintiffs of the warranty extension provided by TSB 19-064.

160. In or about Spring 2025, the Bivens noticed for the first time that their Class Vehicle's paint was failing, bubbling, peeling, delaminating and/or flaking above and around their windshield, one of the most common areas for the Paint Defect to arise on the Class Vehicles (something Honda acknowledged in its 2019 TSBs), as shown in the following photo:



161. The Bivens always properly maintained their Class Vehicle. As a result, the peeling paint on their Class Vehicle's roof and windshield cannot be the result of any other factor except the Paint Defect.

162. In June 2025, the Bivens brought their Class Vehicle to Honda World, the authorized dealer where they purchased their Class Vehicle, seeking repair. Honda World refused to repair the Paint Defect for no charge but, instead, provided the Bivens with an estimate to repair the impacted parts of their Class Vehicle for between $1,100 and $1600, depending on whether it repainted the roof or the roof plus the windshield pillars. The Bivens have not yet repaired the Paint Defect (to the extent it can be

repaired).

163. The Bivens have suffered a concrete and ascertainable loss as a direct and proximate result of Honda's misconduct in that the Bivens overpaid for their Class Vehicle at the time of purchase, the value of their Class Vehicle has been diminished as a result of the Paint Defect, and they will have to pay out-of-pocket to repair a latent Paint Defect Honda was well aware of at the time of sale.

***4. Plaintiffs David and Elizabeth Bowerman***

164. The Bowerman Plaintiffs are residents of Smyrna, Georgia and are citizens of Georgia. In late 2015, the Bowerman Plaintiffs purchased a new 2016 Acura MDX in White Diamond Pearl from Nalley Acura, an authorized Acura dealer located at 1355 Cobb Pkwy SE, Marietta, Georgia 30060. Their Acura cost approximately $50,000.

165. Prior to purchasing the Class Vehicle, the Bowerman Plaintiffs viewed marketing materials that touted the quality, durability, and value of Honda's vehicles, including the Class Vehicle.

166. During sales discussions, Honda's authorized dealer at Nalley Acura emphasized the quality, durability, and aesthetic features of the Class Vehicle and specifically disclosed that the Class Vehicle was available to purchase in white without disclosing the existence of the Paint Defect.

167. The Bowerman Plaintiffs relied on Honda's omissions and the information regarding the quality, durability, and value of the Class Vehicle conveyed in those marketing materials, as well as by the sales representative and/or other personnel, in deciding to purchase their Class Vehicle. Moreover, the Bowerman Plaintiffs specifically wanted to purchase a vehicle in a white color, and the availability of the MDX in White Diamond Pearl was a material factor in their decision to purchase their Class Vehicle.

168. Honda and its authorized dealer failed to disclose the Paint Defect to consumers, including the Bowerman Plaintiffs and other members of the Classes, and the Bowerman Plaintiffs, therefore, purchased their Class Vehicle on the reasonable,

but mistaken, belief that the Class Vehicle's paint was defect free and the Class Vehicle would be a quality and durable vehicle that would retain its value. The Bowerman Plaintiffs would not have purchased the Class Vehicle, or would not have paid as much for it, had they known of the Paint Defect and the propensity of the paint to bubble, peel, delaminate, and flake off the Class Vehicle.

169. Honda did not send notification to the Bowerman Plaintiffs of the warranty extension provided by TSB 19-029.

170. In December 2024, the Bowerman Plaintiffs noticed for the first time that their Acura MDX's paint was failing, bubbling, peeling, delaminating and/or flaking, between the sunroof and the front windshield, one of the most common areas for the Paint Defect to arise on the Class Vehicles (something Honda acknowledged in its 2019 TSBs), as shown in the following picture:



171. The Bowerman Plaintiffs properly maintained their Class Vehicle, and the paint issue between their sunroof and front window cannot be the result of any other factor except the Paint Defect.

172. In or about December 2024, the Bowerman Plaintiffs brought their car to Southern Motors Acura, an authorized Acura dealer located at 102 Park of Commerce Drive, Savanah, GA 31405, seeking repair. Southern Motors Acura refused to repair or to pay to repair the Bowerman Plaintiffs' Acura.

173. Thereafter, in or about December 2024, the Bowerman Plaintiffs contacted Acura Customer Relations, which also refused to repair or to pay to repair the Bowerman Plaintiff's Class Vehicle. Southern Motors Acura and Acura Customer Relations stated a repair would not be covered under Honda's warranty or the extended warranty specifically addressing the paint issue (Technical Service Bulletin 19-029). The Bowerman Plaintiffs have not had their Class Vehicle repainted.

174. The Bowerman Plaintiffs suffered a concrete and ascertainable loss as a direct and proximate result of Honda's misconduct in that the Bowerman Plaintiffs overpaid for their Class Vehicle at the time of purchase, the value of their Class Vehicle has been diminished as a result of the Paint Defect, and they will have to pay out-of-pocket to repair a latent Paint Defect Honda was well aware of at the time of sale.

### *5. __Plaintiff Laurie Galbraith__*

175. Plaintiff Laurie Galbraith is a resident of Porter, Indiana and is a citizen of Indiana. In January 2017, Ms. Galbraith purchased a Certified Pre-owned 2017 Honda HR-V in White Orchid Pearl paint from Bosak (now Victory) Honda 710 E. HWY 20, Michigan City, Indiana 46360, an authorized Honda dealer. Ms. Galbraith paid $27,098 to purchase the Class Vehicle (before trade-in and rebate).

176. Prior to purchasing the Class Vehicle, Ms. Galbraith viewed marketing materials that touted the quality, durability, and value of Honda's vehicles, including the Class Vehicle

177. In addition, during sales discussions, Honda's authorized dealer at Bosak Honda emphasized the quality, durability, and aesthetic features of the Class Vehicle and specifically disclosed that the Class Vehicle was available to purchase in white without disclosing the existence of the Paint Defect.

178. Ms. Galbraith relied on Honda's omissions and on the information regarding the quality, durability, and value of the Class Vehicle conveyed in those marketing materials, as well as by the sales representative and/or other personnel, in deciding to purchase her Class Vehicle. Moreover, Ms. Galbraith specifically wanted

to purchase a vehicle in a white color, and the availability of the Honda HR-V in White Orchid Pearl was a material factor in her decision to purchase her Class Vehicle.

179. Honda failed to disclose the Paint Defect to consumers, including Ms. Galbraith and other members of the Class, and Ms. Galbraith, therefore, purchased her Class Vehicle on the reasonable, but mistaken, belief that the Class Vehicle's paint was defect free and the Class Vehicle would be a quality and durable vehicle that would retain its value. Ms. Galbraith would not have purchased the Class Vehicle, or would not have paid as much for it, had she known of the Paint Defect and the propensity of the white paint to bubble, peel, delaminate and flake off the Class Vehicle.

180. In Fall 2024, Ms. Galbraith noticed for the first time that her Honda HR-V's paint was failing, bubbling, peeling, delaminating and/or flaking, between the sunroof and the front windshield, one of the most common areas for the Paint Defect to arise on the Class Vehicles (something Honda acknowledged in its 2019 TSBs)

181. Ms. Galbraith properly maintained her Class Vehicle, and the paint peeling on her Class Vehicle's roof cannot be the result of any other factor except the Paint Defect.

182. In Summer 2025, Ms. Galbraith brought her Class Vehicle to Bosak/Victory Honda, seeking a repair of the Paint Defect. Bosak/Victory Honda refused to repair or to pay to repair Ms. Galbraith's Class Vehicle, claiming that the extended warranty provided by TSB 19-064 had expired for her Class Vehicle.

183. In mid-2025, after Bosak/Victory Honda refused to repair or pay to repair the Paint Defect without charge, Ms. Galbraith took her vehicle to an unaffiliated body shop to repair the Paint Defect, paying $2,771 to have the roof portion of the Class Vehicle repainted. Ms. Galbraith decided to attempt to repair the Paint Defect, despite the steep out-of-pocket costs, to prevent rusting and corrosion and to preserve the aesthetics of the Class Vehicle

184. Repainting Ms. Galbraith's Class Vehicle did not remedy the Paint Defect. Even if her Class Vehicle was repainted properly, the Class Vehicle's latent Paint

Defect will very likely manifest on other parts of the Class Vehicle. Moreover, repainting Ms. Galbraith's Class Vehicle will not restore the Class Vehicle to the value it would have had without the Paint Defect (and as bargained for by Ms. Galbraith) and repainting the Class Vehicle has permanently reduced her Class Vehicle's value.

185. Ms. Galbraith has suffered a concrete and ascertainable loss as a direct and proximate result of Honda's misconduct in that Ms. Galbraith overpaid for her Class Vehicle at the time of purchase, the value of her Class Vehicle has been diminished as a result of the Paint Defect, and she has paid out-of-pocket costs to repair a latent Paint Defect Honda was well aware of at the time of sale

***6. Plaintiff Eliska Gimenez-Picou***

186. Eliska Gimenez-Picou is a resident of Virginia Beach, Virginia, and is a citizen of Virginia. In 2019, Ms. Gimenez-Picou purchased a new 2019 Honda HRV in Platinum White Pearl paint from Hall Honda, an authorized Honda dealer located at 3516 Virginia Beach Boulevard, Virginia Beach, Virginia 23452. Ms. Gimenez-Picou paid approximately $25,000 for the Class Vehicle.

187. Prior to purchasing the Class Vehicle, Mr. Gimenez-Picou viewed marketing materials that touted the quality, durability, and value of Honda's vehicles, including the Class Vehicle.

188. In addition, when Ms. Gimenez-Picou was purchasing her Class Vehicle, Hall Honda's sales representatives emphasized the quality, durability, and aesthetic features of the Class Vehicle, as well as the quality of Honda's vehicles generally. The sales representative who sold Ms. Gimenez-Picou her Class Vehicle specifically disclosed that the Class Vehicle was available to purchase in white without disclosing the existence of the Paint Defect and stated that "white cars don't show dirt as much," suggesting that white paint was the superior aesthetic choice and would require less maintenance versus other potential colors.

189. Ms. Gimenez-Picou relied on Honda's omissions and the information regarding the quality, durability, and value of the Class Vehicle conveyed in those

marketing materials, as well as by the sales representative and/or other personnel, in deciding to purchase her Class Vehicle. Moreover, Ms. Gimenez-Picou specifically wanted to purchase a vehicle in a white color, and the availability of the Honda HR-V in Platinum White Pearl paint, and purported dirt-resistant property of white paint, was a material factor in her decision to purchase her Class Vehicle.

190. Honda failed to disclose the Paint Defect to consumers, including Ms. Gimenez-Picou and other members of the Class, and Ms. Gimenez-Picou, therefore, purchased her Class Vehicle on the reasonable, but mistaken, belief that it would be a quality and durable vehicle that would retain its value. Ms. Gimenez-Picou would not have purchased the Class Vehicle, or would not have paid as much for it, had she known of the Paint Defect and the propensity of the white paint to bubble, peel, delaminate, and flake off the Class Vehicle.

191. In or about Summer 2025, Ms. Gimenez-Picou noticed for the first time that her Honda HRV's paint was failing, bubbling, peeling, delaminating and/or flaking, between the sunroof and the front windshield, one of the most common areas for the Paint Defect to arise on the Class Vehicles (something Honda acknowledged in its 2019 TSBs), as shown in the following picture:



192. Ms. Gimenez-Picou properly maintained her Class Vehicle, and the paint problems between her sunroof and front window cannot be the result of any other factor except the Paint Defect.

193. In or about Summer 2025, Ms. Gimenez-Picou brought her Class Vehicle into Hall Honda, the authorized Honda dealer where she purchased her Class Vehicle, seeking to repair her Class Vehicle.

194. In or about Summer 2025, Hall Honda estimated that it would cost $3,328.25 to repair the Paint Defect and also asserted that any repair would not be covered under Honda's warranties.

195. In or about Summer 2025, Ms. Gimenez-Picou reached out to Honda customer relations by email and telephone demanding that Honda repair or pay to repair the Paint Defect. After various communications with Honda customer relations and repeated demands from Ms. Gimenez-Picou, Honda asserted that the repair was not covered by Honda's warranties and refused to repair the Paint Defect or pay to repair the Paint Defect. Ms. Gimenez-Picou has not yet repaired the Paint Defect (to the extent it can be repaired).

196. Ms. Gimenez-Picou has suffered a concrete and ascertainable loss as a direct and proximate result of Honda's misconduct in that Mr. Gimenez-Picou overpaid for her Class Vehicle at the time of purchase, the value of her Class Vehicle has been diminished as a result of the Paint Defect, and she will have to pay out-of-pocket to repair a latent Paint Defect Honda was well aware of at the time of sale.

***7. <u>Plaintiff Nicholas Hrabovsky</u>***

197. Plaintiff Nicholas Hrabovsky is a resident of St. Louis, Missouri and is a citizen of Missouri. In May 2024, Mr. Hrabovsky purchased a used 2015 Acura MDX in White Diamond Pearl paint from Mungenast St. Louis Acura, 13720 Manchester Rd, Manchester, Missouri 63011. Mr. Hrabovsky paid $12,000 to purchase the Class Vehicle.

198. Prior to purchasing the Class Vehicle, Mr. Hrabovsky viewed marketing

materials that touted the quality, durability, and value of Honda's vehicles, including the Class Vehicle.

199. During sales discussions, Honda's authorized dealer at Mungenast St. Louis Acura emphasized the quality, durability, and aesthetic features of the Class Vehicle and specifically disclosed that the Class Vehicle was available to purchase in white without disclosing the existence of the Paint Defect.

200. Mr. Hrabovsky relied on the information regarding the quality, durability, and value of the Class Vehicle conveyed in those marketing materials, as well as by the sales representative and/or other personnel, in deciding to purchase his Class Vehicle. The availability of the Acura MDX in White Diamond Pearl was a material factor in his decision to purchase his Class Vehicle.

201. Honda failed to disclose the Paint Defect to consumers, including Mr. Hrabovsky and other members of the Class, and Mr. Hrabovsky, therefore, purchased his Class Vehicle on the reasonable, but mistaken, belief that the Class Vehicle's paint was defect free and the Class Vehicle would be a quality and durable vehicle that would retain its value. Mr. Hrabovsky would not have purchased the Class Vehicle, or would not have paid as much for it, had Honda disclosed the Paint Defect and the propensity of the white paint to bubble, peel, delaminate and flake off the Class Vehicle. He either would not have bought the vehicle for the price she paid, or he would have purchased the Class Vehicle in a different color.

202. Honda did not send notification to Ms. Hrabovsky of the warranty extension provided by TSB 19-029.

203. In 2025, Mr. Hrabovsky noticed for the first time that his Class Vehicle's paint was failing, bubbling, peeling, delaminating and/or flaking above his windshield, one of the most common areas for the Paint Defect to arise on the Class Vehicles (something Honda acknowledged in its 2019 TSBs), as shown in the following photos:





204. Mr. Hrabovsky always properly maintained his Class Vehicle. As a result, the peeling paint on her Class Vehicle's roof cannot be the result of any other factor except the Paint Defect.

205. Mr. Hrabovsky has not yet repaired the Paint Defect (to the extent it can be repaired).

206. Mr. Hrabovsky has suffered a concrete and ascertainable loss as a direct and proximate result of Honda's misconduct in that Mr. Hrabovsky overpaid for his Class Vehicle at the time of purchase, the value of his Class Vehicle has been diminished as a result of the Paint Defect, and he will have to pay out-of-pocket to repair a latent Paint Defect Honda was well aware of at the time of sale.

***8. Plaintiffs John and Susan Novack***

207. Plaintiffs John and Susan Novack are residents of Bradenton, Florida, and are citizens of Florida. In late 2017, the Novack Plaintiffs purchased a new 2018 Honda HR-V in White Orchid Pearl paint from Buerkle Honda, an authorized Honda dealer located at 3360 Highway 61 N. St. Paul, Minnesota 55110. Their Honda HR-V cost approximately $32,000.

208. Prior to purchasing the Class Vehicle, the Novack Plaintiffs viewed marketing materials that touted the quality, durability, and value of Honda's vehicles, including the Class Vehicle.

209. In addition, during sales discussions, Honda's authorized dealer at Buerkle Honda emphasized the quality, durability, and aesthetic features of the Class Vehicle and specifically disclosed that the Class Vehicle was available to purchase in white without disclosing the existence of the Paint Defect.

210. The Novack Plaintiffs relied on Honda's omissions and the information regarding the quality, durability, and value of the Class Vehicle conveyed in those marketing materials, as well as by the sales representative and/or other personnel, in deciding to purchase their Class Vehicle. Moreover, the Novack Plaintiffs specifically wanted to purchase a vehicle in a white color, and the availability of the Honda HRV in White Orchid Pearl was a material factor in their decision to purchase their Class Vehicle.

211. Honda and its authorized dealer failed to disclose the Paint Defect to consumers, including the Novack Plaintiffs and other members of the Classes, and the Novack Plaintiffs, therefore, purchased their Class Vehicle on the reasonable, but mistaken, belief that their paint was defect-free and the Class Vehicle would be a quality and durable vehicle that would retain its value. The Novack Plaintiffs would not have purchased the Class Vehicle, or would not have paid as much for it, had they known of the Paint Defect and the propensity of the paint to bubble, peel, delaminate, and flake off the Class Vehicle.

212. Honda did not send notification to the Novack Plaintiffs of the warranty extension provided by TSB 19-064.

213. In March 2025, the Novack Plaintiffs noticed for the first time that their Honda HRV's paint was failing, bubbling, peeling, delaminating and/or flaking, between the sunroof and the front windshield, one of the most common areas for the Paint Defect to arise on the Class Vehicles (something Honda acknowledged in its 2019 TSBs), as shown in the following photo:



214. The Novack Plaintiffs properly maintained their Class Vehicle, and the paint problem between their sunroof and front window cannot be the result of any other factor except the Paint Defect.

215. In or about April 2025, the Novack Plaintiffs emailed Buerkle Honda, the same authorized Honda dealership that sold them their Class Vehicle, seeking repair. Buerkle Honda refused to repair or to pay to repair the Novack Plaintiffs' Honda.

216. On that same day, the Novack Plaintiffs contacted Honda Customer relations, which also refused to repair or to pay to repair the Novack Plaintiffs' Honda. Buerkle Honda and Honda Customer Relations stated a repair would not be covered under Honda's warranty or the extended warranty specifically addressing the paint issue (Technical Service Bulletin 19-055).

217. From the end of May to the beginning of June, 2025, the Novack Plaintiffs paid Caliber Collision $2,493.13 out of pocket to repair the Paint Defect. Caliber Collision re-painted the roof of the car but not the rest of the car. The Novacks decided to attempt to repair the Paint Defect, despite the steep out-of-pocket costs, to prevent rusting and corrosion and to preserve the aesthetics of the Class Vehicle

218. Repainting the roof of the Novack Plaintiffs' Class Vehicle did not remedy the Paint Defect. Even if their Class Vehicle's roof was repainted properly (which is not clear at this early stage), the Class Vehicle's latent Paint Defect will very likely

manifest on other parts of the Class Vehicle. Moreover, repainting the Novack Plaintiffs' Class Vehicle did not restore the Class Vehicle to the value it would have had without the Paint Defect (and as bargained for by the Novack Plaintiffs) and repainting the Class Vehicle has permanently reduced her Class Vehicle's value.

219. The Novack Plaintiffs suffered a concrete and ascertainable loss as a direct and proximate result of Honda's misconduct in that the Novack Plaintiffs overpaid for their Class Vehicle at the time of purchase, the value of their Class Vehicle has been diminished as a result of the Paint Defect, and they have paid and will potentially have to pay out-of-pocket to repair a latent Paint Defect Honda was well aware of at the time of sale.

***9. Plaintiff Michael Parvin***

220. Plaintiff Michael Parvin is a resident of Port Royal, South Carolina and is a citizen of South Carolina. In 2018, Mr. Parvin purchased a new 2018 Honda Civic in Platinum White Pearl paint from Stokes Honda Cars of Beaufort, 88 Robert Smalls Parkway, Beaufort, South Carolina 29906. Mr. Parvin paid $27,000 to purchase the Class Vehicle.

221. Prior to purchasing the Class Vehicle, Mr. Parvin viewed marketing materials that touted the quality, durability, and value of Honda's vehicles, including the Class Vehicle.

222. During sales discussions, Honda's authorized dealer at Stokes Honda emphasized the quality, durability, and aesthetic features of the Class Vehicle and specifically disclosed that the Class Vehicle was available to purchase in white without disclosing the existence of the Paint Defect.

223. Mr. Parvin relied on the information regarding the quality, durability, and value of the Class Vehicle conveyed in those marketing materials, as well as by the sales representative and/or other personnel, in deciding to purchase his Class Vehicle. The availability of the Honda Civic in Platinum White Pearl was a material factor in his decision to purchase his Class Vehicle.

224. Honda failed to disclose the Paint Defect to consumers, including Mr. Parvin and other members of the Class, and Mr. Parvin, therefore, purchased his Class Vehicle on the reasonable, but mistaken, belief that the Class Vehicle's paint was defect free and the Class Vehicle would be a quality and durable vehicle that would retain its value. Mr. Parvin would not have purchased the Class Vehicle, or would not have paid as much for it, had Honda disclosed the Paint Defect and the propensity of the white paint to bubble, peel, delaminate and flake off the Class Vehicle. He either would not have bought the vehicle for the price she paid, or he would have purchased the Class Vehicle in a different color.

225. In 2023, Mr. Parvin noticed for the first time that his Class Vehicle's paint was failing, bubbling, peeling, delaminating and/or flaking above his windshield, one of the most common areas for the Paint Defect to arise on the Class Vehicles (something Honda acknowledged in its 2019 TSBs), as shown in the following photo:



226. Mr. Parvin always properly maintained his Class Vehicle. As a result, the peeling paint on his Class Vehicle's hood and roof cannot be the result of any other factor except the Paint Defect.

227. Mr. Parvin has not yet repaired the Paint Defect (to the extent it can be repaired), and paint peeling continues to worsen and spread on his Class Vehicle.

228. Mr. Parvin has suffered a concrete and ascertainable loss as a direct and proximate result of Honda's misconduct in that Mr. Parvin overpaid for his Class Vehicle at the time of purchase, the value of her Class Vehicle has been diminished as a result of the Paint Defect, and he will have to pay out-of-pocket to repair a latent Paint Defect Honda was well aware of at the time of sale.

***10. <u>Plaintiff On-Uma Radigan</u>***

229. Plaintiff On-Uma Radigan is a resident of Seattle, Washington and is a citizen of Washington. In April 2017, Ms. Radigan purchased a new 2017 Honda HR-V in White Orchid Pearl paint from Honda of Seattle, an authorized Honda dealer located at 2005 Airport Wy S, Seattle, WA 98134. Ms. Radigan paid approximately $28,000 to purchase the Class Vehicle.

230. Prior to purchasing the Class Vehicle, Ms. Radigan viewed marketing materials that touted the quality, durability, and value of Honda's vehicles, including the Class Vehicle.

231. In addition, during sales discussions, Honda's authorized dealer at Honda of Seattle emphasized the quality, durability, and aesthetic features of the Class Vehicle and specifically disclosed that the Class Vehicle was available to purchase in white without disclosing the existence of the Paint Defect.

232. Ms. Radigan relied on Honda's omissions and on the information regarding the quality, durability, and value of the Class Vehicle conveyed in those marketing materials, as well as by the sales representative and/or other personnel, in deciding to purchase her Class Vehicle. Moreover, Ms. Radigan specifically wanted to purchase a vehicle in a white color, and the availability of the Honda HR-V in White Orchid Pearl was a material factor in her decision to purchase her Class Vehicle.

233. Honda failed to disclose the Paint Defect to consumers, including Ms. Radigan and other members of the Class, and Ms. Radigan, therefore, purchased her

Class Vehicle on the reasonable, but mistaken, belief that the Class Vehicle's paint was defect free and the Class Vehicle would be a quality and durable vehicle that would retain its value. Ms. Radigan would not have purchased the Class Vehicle, or would not have paid as much for it, had she known of the Paint Defect and the propensity of the white paint to bubble, peel, delaminate and flake off the Class Vehicle.

234. In late 2023, Ms. Beaton noticed for the first time that her Honda HR-V's paint was failing, bubbling, peeling, delaminating and/or flaking between Class Vehicle's windshield and sunroof, one of the most common locations for the Paint Defect to manifest (something Honda acknowledged in its 2019 TSBs), as shown in the following picture:



235. Ms. Radigan properly maintained her Class Vehicle, and the paint problem throughout her Class Vehicle cannot be the result of any other factor except the Paint Defect.

236. In 2024, Ms. Radigan contacted Honda of Seattle to report the Paint Defect and to seek a repair. Honda of Seattle refused Ms. Radigan's demand that it repair or pay to repair Ms. Radigan's Honda HR-V.

237. Ms. Radigan has not yet paid out-of-pocket to have her Class Vehicle repainted, and the paint peeling continues to spread and worsen.

238. Ms. Radigan has suffered a concrete and ascertainable loss as a direct and proximate result of Honda's misconduct in that Ms. Radigan overpaid for her Class Vehicle at the time of purchase, the value of her Class Vehicle has been diminished as a result of the Paint Defect, and she will have to out-of-pocket costs to repair a latent Paint Defect Honda was well aware of at the time of sale.

***11. <u>Plaintiff Rebecca Taylor</u>***

239. Plaintiff Rebeca Taylor is a resident of New Lenox, Illinois and is a citizen of Illinois. In November 2015, Ms. Taylor purchased a new 2016 Honda HR-V in White Orchid Pearl paint from Valley Honda, 4173 Ogden Avenue Aurora, Illinois 60504. Ms. Taylor paid approximately $23,000 to purchase the Class Vehicle.

240. Prior to purchasing the Class Vehicle, Ms. Taylor viewed marketing materials that touted the quality, durability, and value of Honda's vehicles, including the Class Vehicle

241. In addition, during sales discussions, Honda's authorized dealer at Valley Honda emphasized the quality, durability, and aesthetic features of the Class Vehicle and specifically disclosed that the Class Vehicle was available to purchase in white without disclosing the existence of the Paint Defect.

242. Ms. Taylor relied on Honda's omissions and on the information regarding the quality, durability, and value of the Class Vehicle conveyed in those marketing materials, as well as by the sales representative and/or other personnel, in deciding to purchase her Class Vehicle. Moreover, Ms. Taylor specifically wanted to purchase a vehicle in a white color, and the availability of the Honda HR-V in White Orchid Pearl was a material factor in her decision to purchase her Class Vehicle.

243. Honda failed to disclose the Paint Defect to consumers, including Ms. T Taylor and other members of the Class, and Ms. Taylor, therefore, purchased her Class Vehicle on the reasonable, but mistaken, belief that the Class Vehicle's paint was defect

free and the Class Vehicle would be a quality and durable vehicle that would retain its value. Ms. Taylor would not have purchased the Class Vehicle, or would not have paid as much for it, had she known of the Paint Defect and the propensity of the white paint to bubble, peel, delaminate and flake off the Class Vehicle.

244. In mid-May 2023, Ms. Taylor noticed for the first time that her Honda HR-V's paint was failing, bubbling, peeling, delaminating and/or flaking across her entire Class Vehicle, including the roof area of the Class Vehicle, one of the most common areas for the Paint Defect to arise on the Class Vehicles (something Honda acknowledged in its 2019 TSBs), as shown in the following photos:



245. Ms. Taylor properly maintained her Class Vehicle, and the paint peeling on her Class Vehicle's roof cannot be the result of any other factor except the Paint Defect.

246. Throughout 2023, Ms. Taylor contacted multiple authorized Honda dealerships, Honda Customer Relations, and Honda International demanding that Honda cover the full cost of repainting her Class Vehicle. Honda Customer Relations and Honda International did not meaningfully respond to Ms. Taylor's requests and

refused to open a case for her because her peeling began slightly outside the extended warranty period provided by TSB 19-064

247. However, in December 2023, an authorized Honda dealer agreed to repaint the portion of Ms. Taylor's Class Vehicle with peeling paint for $500. Honda's authorized dealers purported to pay $500 for the repair and further represented that Honda purportedly agreed to pay the rest of the cost of the repair.

248. In January 2024, shortly after Honda's authorized dealer repainted her Class Vehicle's roof, Ms. Taylor sold her Class Vehicle after paint again began to peel off the Class Vehicle's door, a portion of the Class Vehicle Honda's authorized dealer did not repaint. The Class Vehicle's resale value was substantially impacted by the Paint Defect.

249. Ms. Taylor has suffered a concrete and ascertainable loss as a direct and proximate result of Honda's misconduct in that Ms. Taylor overpaid for her Class Vehicle at the time of purchase, the value of her Class Vehicle was diminished as a result of the Paint Defect, and she had to resell her at a discount based on the Paint Defect, and she paid out-of-pocket costs to repair a latent Paint Defect Honda was well aware of at the time of sale.

***12. <u>Plaintiff Elizabeth Torres</u>***

250. Plaintiff Elizabeth Torres is a resident of Naples, Florida and is a citizen of Florida. In December 2016, Ms. Torres purchased a new 2017 Honda HR-V in White Orchid Pearl paint from AutoNation Honda, an authorized Honda dealer located at 230 Auto Mall Dr., in Roseville, California. Ms. Torres paid approximately $21,000 to purchase the Class Vehicle.

251. Prior to purchasing the Class Vehicle, Ms. Torres viewed marketing materials that touted the quality, durability, and value of Honda's vehicles, including the Class Vehicle

252. In addition, during sales discussions, Honda's authorized dealer at AutoNation Honda emphasized the quality, durability, and aesthetic features of the

Class Vehicle and specifically disclosed that the Class Vehicle was available to purchase in white without disclosing the existence of the Paint Defect.

253. Ms. Torres relied on Honda's omissions and on the information regarding the quality, durability, and value of the Class Vehicle conveyed in those marketing materials, as well as by the sales representative and/or other personnel, in deciding to purchase her Class Vehicle. Moreover, Ms. Torres specifically wanted to purchase a vehicle in a white color, and the availability of the Honda HR-V in White Orchid Pearl was a material factor in her decision to purchase her Class Vehicle.

254. Honda failed to disclose the Paint Defect to consumers, including Ms. Torres and other members of the Class, and Ms. Torres, therefore, purchased her Class Vehicle on the reasonable, but mistaken, belief that the Class Vehicle's paint was defect free and the Class Vehicle would be a quality and durable vehicle that would retain its value. Ms. Torres would not have purchased the Class Vehicle, or would not have paid as much for it, had she known of the Paint Defect and the propensity of the white paint to bubble, peel, delaminate and flake off the Class Vehicle.

255. Honda did not send notification to Ms. Torres of the warranty extension provided by TSB 19-064.

256. In 2023, Ms. Torres noticed for the first time that her Honda HR-V's paint was failing, bubbling, peeling, delaminating and/or flaking across her entire Class Vehicle, including the roof area of the Class Vehicle, one of the most common areas for the Paint Defect to arise on the Class Vehicles (something Honda acknowledged in its 2019 TSBs), as shown in the following photos:





257. Ms. Torres properly maintained her Class Vehicle, and the paint problem throughout her Class Vehicle cannot be the result of any other factor except the Paint Defect.

258. In 2025, Ms. Torres contacted Honda Customer Relations demanding that Honda cover the full cost of repainting her Class Vehicle. After various communications with Honda customer relations, Honda asserted that the repair was not covered by the extended warranty, and Honda refused to reimburse, to repair, or to pay

to repair Ms. Torres' vehicle.

259. In mid-2025, Ms. Torres took her vehicle to Germain Honda of Naples, an authorized Honda dealer located at 3295 Pine Ridge Rd, Naples, FL 34109, also seeking a repair. Germain Honda stated it would not fully pay to repair the paint defect but, instead, stated that it (or Honda) would cover half the cost of the repair, and referred Ms. Torres to an affiliated body shop, Supreme Auto, located at 938 4th Avenue, Naples, Florida 34102 to receive the repair.

260. Supreme Auto is repainting Ms. Torres's Class Vehicle, and a Supreme Auto technician told Ms. Torres that he had repainted approximately 300 Hondas suffering from the Paint Defect. Ms. Torres paid $2,200 for the purported repair, and Honda or Germain Honda purportedly paid the other $2,200 for the repair. Ms. Torres decided to attempt to repair the Paint Defect, despite the steep out-of-pocket costs, to prevent rusting and corrosion and to preserve the aesthetics of the Class Vehicle

261. Repainting Ms. Torres's Class Vehicle did not remedy the Paint Defect. Even if her Class Vehicle is repainted properly (which is not clear at this early stage), the Class Vehicle's latent Paint Defect will very likely manifest on other parts of the Class Vehicle. Moreover, repainting Ms. Torres's Class Vehicle will not restore the Class Vehicle to the value it would have had without the Paint Defect (and as bargained for by Ms. Torres) and repainting the Class Vehicle has permanently reduced her Class Vehicle's value.

262. Ms. Torres has suffered a concrete and ascertainable loss as a direct and proximate result of Honda's misconduct in that Ms. Torres overpaid for her Class Vehicle at the time of purchase, the value of her Class Vehicle has been diminished as a result of the Paint Defect, and she has paid out-of-pocket costs to repair a latent Paint Defect Honda was well aware of at the time of sale.

***13. Plaintiff Bingyi Yang***

263. Plaintiff Bingyi Yang is a resident of Greenville, South Carolina and citizen of South Carolina. In December 2014, Mr. Yang purchased a new 2015 Acura

MDX in White Diamond Pearl paint from Mac Churchill Acura, 3125 NE Loop 820, Fort Worth, Texas (now called Hiley Acura of Fort Worth), an authorized Acura dealer. Mr. Yang paid approximately $42,000 to purchase the Class Vehicle.

264. Prior to purchasing the Class Vehicle, Mr. Yang viewed marketing materials that touted the quality, durability, and value of Honda's vehicles, including the Class Vehicle.

265. During sales discussions, Honda's authorized dealer at Mac Churchill Acura emphasized the quality, durability, and aesthetic features of the Class Vehicle and specifically disclosed that the Class Vehicle was available to purchase in white without disclosing the existence of the Paint Defect.

266. Mr. Yang relied on the information regarding the quality, durability, and value of the Class Vehicle conveyed in those marketing materials, as well as by the sales representative and/or other personnel, in deciding to purchase his Class Vehicle. The availability of the Acura MDX in White Diamond Pearl was a material factor in his decision to purchase his Class Vehicle.

267. Honda failed to disclose the Paint Defect to consumers, including Mr. Yang and other members of the Class, and Mr. Yang, therefore, purchased his Class Vehicle on the reasonable, but mistaken, belief that the Class Vehicle's paint was defect free and the Class Vehicle would be a quality and durable vehicle that would retain its value. Mr. Yang would not have purchased the Class Vehicle, or would not have paid as much for it, had Honda disclosed the Paint Defect and the propensity of the white paint to bubble, peel, delaminate and flake off the Class Vehicle. He either would not have bought the vehicle for the price she paid, or he would have purchased the Class Vehicle in a different color.

268. Honda did not send notification to Mr. Yang of the warranty extension provided by TSB 19-029.

269. In or about November 2024, Mr. Yang noticed for the first time that his Class Vehicle's paint was failing, bubbling, peeling, delaminating and/or flaking above

and around his windshield, one of the most common areas for the Paint Defect to arise on the Class Vehicles (something Honda acknowledged in its 2019 TSBs), as shown in the following photo:



270. Mr. Yang properly maintained his Class Vehicle at all times. As a result, the peeling paint on his Class Vehicle's roof cannot be the result of any other factor except the Paint Defect.

271. After Mr. Yang saw the peeling paint, he wrote to Acura Client Relations and asked the dealership about the peeling paint to determine whether Honda would repair the defective paint. Honda refused to repair or to pay to repair Mr. Yang's Acura, either through the dealership or through Acura's Client Relations Department. Acura Client Relations stated a repair would not be covered under Honda's warranty or the extended warranty specifically addressing the paint issue (Technical Service Bulletin 19-029).

272. Mr. Yang has suffered a concrete and ascertainable loss as a direct and proximate result of Honda's misconduct in that Mr. Yang overpaid for his Class Vehicle at the time of purchase, the value of his Class Vehicle has been diminished as a result of the Paint Defect, and he will have to pay out-of-pocket to repair a latent Paint Defect Honda was well aware of at the time of sale.

**G. Plaintiffs and Class Members Suffered Damages Caused by the Paint Defect**

273. Plaintiffs and Class members purchased the Class Vehicles based on their reasonable but mistaken belief that their Class Vehicles were of high quality, durable, and free of defects. However, the Class Vehicles delivered by Honda were not those for which Plaintiffs and Class members bargained. Rather, the Class Vehicles suffered from the Paint Defect.

274. Had Plaintiffs and Class members known of the Paint Defect, they would have either: (1) paid substantially less for the Class Vehicles; (2) required an immediate remedy that restored the Class Vehicles to the conditions bargained for; (3) not purchased or leased the Class Vehicles; or (4) purchased or leased the Class Vehicles in an alternative color.

275. As a result of the disparity between the quality of the Class Vehicles negotiated for and the Class Vehicles actually received, Plaintiffs and Class members suffered economic harm. This economic harm can be quantified as: (1) the economic value of an effective remedy that restores the Class Vehicles to their expected conditions (or the economic harm from the lack of that remedy); (2) the discount that Plaintiffs and Class members would have required to accept the Class Vehicles in their actual condition; and/or (3) the diminished value of the Class Vehicles, both those that have been repainted and those that have not.

276. Plaintiffs and Class members paid premiums to purchase the Class Vehicles because of the brand, quality, durability, and value representations made by Honda. A vehicle purchased or leased with the reasonable expectation that it is of high quality and durable as advertised is worth more than a vehicle known to be subject to the problems or risks associated with the Paint Defect. Plaintiffs and Class members were harmed from the day they drove their Class Vehicles off the lot because they did not get what they paid for – a high-quality and durable vehicle that would retain its value under normal conditions.

277. As a direct result of Honda's misrepresentations and omissions, Plaintiffs

and Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain. Plaintiffs and Class members paid a premium for the Class Vehicles, which Honda advertised as being durable and of high-quality and received Class Vehicles that contained a known but concealed Paint Defect. Honda was unjustly enriched because it obtained and retained monies paid by Plaintiffs and Class members who paid a price for the Class Vehicles that was higher than the value of the vehicles they received in return.

278. The widespread disclosure of the Paint Defect has caused a decrease in the value of the Class Vehicles, and, therefore, Plaintiffs and Class members have suffered a direct pecuniary loss in the form of the decreased value of their Class Vehicles, even when the Paint Defect has not yet manifested.

279. Moreover, as evidenced by the experiences of Plaintiffs and other Class members, repainting the Class Vehicles, even if done properly, does not remedy the Paint Defect and does not remedy the diminution of value that occurs because of the repainting.

280. For all the Class Vehicles, the factory paint was applied by robots to exacting tolerances consistently over all body panels—a point highlighted by Honda when marketing the Vehicles to customers—whereas the repair process is haphazard at best and results in paint inconsistencies relative to appearance and longevity.

281. Indeed, the repainting of a Class Vehicle could never achieve the same finish that is produced during the original painting of the Vehicle given the equipment and methods used by Honda in the paint system that is applied to the pristine body of a Class Vehicle, not to mention the pristine and strictly controlled environment in which the paint system is applied.

282. Even if the Class Vehicles were properly repainted, their values would still be diminished, as repainted newer vehicles are worth less than vehicles with original paint. Indeed, there is a stigma associated with a repainted vehicle, especially from a luxury brand like Acura, and the fact that a vehicle has been repainted is often used by

a potential buyer as a bargaining chip to lower the price

283. In addition, anticipated car purchasers often shy away from a vehicle that has been repainted, as it rings alarm bells that the vehicle may have been damaged in an accident and repainted as a result. A non-original paint job could also be an indication of major body repairs to the Class Vehicle that are being hidden, not to mention rust.

284. According to an online poll conducted by CarMax, 72% of respondents said that repainting the car is the strongest indicator of vehicle damage. In fact, CarMax states that repainting is one of the biggest warning signs indicating a vehicle may have been in a major accident, and instructs consumers to do the following in order to determine whether a used car may have been in a serious accident:

> Look for signs of repainting on the car, such as inconsistency in the paintwork or paint on the molding or gaskets. Run your finger along the inside of the door edge and see if the finish is smooth or rough. A rough finish can be caused by overspray during repainting. If signs of repainting are found, ask additional questions to determine if the paintwork was for minor scratches and dents or to cover up more serious vehicle damage.[25]

285. CarMax's vehicle appraisals are determined, among other criteria, by its inspection of a "car's condition both inside and out," and it notes that "major defects" can impact their offers. CarMax significantly lowers the appraised values for vehicles, including the Class Vehicles, that have been repainted

286. As a result of Honda's unfair, deceptive, and/or fraudulent business practices, and its failure to disclose the Paint Defect and the problems associated therewith, owners and lessees of the Class Vehicles have suffered losses in money and/or property.

---

[25] CarMax, *Carmax.com "Quick Poll" Finds Consumers Often Misidentify Damage Indicators* (Apr. 8, 2008), http://investors.carmax.com/news-releases/news-releases-details/2008/VIDEO-CarMax-Offers-Tips-to-Spot-Hidden-Vehicle-Damage/default.aspx.

### H. Fraudulent Concealment Allegations

287. Absent discovery, Plaintiffs are unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals at Honda responsible for disseminating false and misleading marketing materials and information regarding the Class Vehicles. Honda necessarily possesses or has access to all of this information,

288. Plaintiffs' claims arise out of Honda's fraudulent concealment of the Paint Defect and the peeling, delaminating, flaking, and bubbling of the Class Vehicles' paint it causes, and its representations about the quality, durability, and value of the Class Vehicles, including the paint used on the Class Vehicles

289. To the extent that Plaintiffs' claims arise from Honda's fraudulent concealment, there is no one document or communication, and no one interaction, upon which Plaintiffs base their claims. Plaintiffs allege that at all relevant times, including specifically at the time they purchased their Class Vehicles, Honda knew, or was reckless in not knowing, of the Paint Defect; Honda was under a duty to disclose the Paint Defect based upon its exclusive knowledge of it, its affirmative representations about it, and its concealment of it, and Honda never disclosed the Paint Defect to Plaintiffs or the public at any time or place or in any manner.

290. Plaintiffs make the following specific fraud allegations with as much specificity as possible although they do not have access to information necessarily available only to Honda:

291. *Who:* Honda and its authorized dealers actively concealed the Paint Defect from Plaintiffs and Class members while simultaneously touting the quality and durability of the Class Vehicles, as alleged in Section A, above. Plaintiffs are unaware of, and therefore unable to identify, the true names and identities of those specific individuals at Honda responsible for such decisions.

292. *What*: Honda knew, or was reckless in not knowing, that the Class Vehicles contain the Paint Defect, as alleged in Section A, above. Honda failed to

disclose and concealed the Paint Defect and made contrary representations about the quality and durability, and other attributes of the Class Vehicles, as specified above in Sections D and F, *supra*.

293. *When*: Honda concealed material information regarding the Paint Defect at all times and made representations about the quality and durability of the Class Vehicles, starting no later than late 2012, or at the subsequent introduction of certain models of Class Vehicles to the market, continuing through the time of sale, and on an ongoing basis, and continuing to this day.

294. Honda and its authorized dealers specifically concealed the nature and extent of the Paint Defect from Plaintiffs when Plaintiffs purchased their Class Vehicles: Plaintiff Attika in 2019; Plaintiff Beaton in 2023; the Biven Plaintiffs in 2020; Bowerman Plaintiffs in 2015; Plaintiff Galbraith in 2018; Plaintiff Gimenez-Picou in 2019; Plaintiff Hrabovsky in 2024; the Novack Plaintiffs in 2017; Plaintiff Parvin in 2018; Plaintiff Radigan in 2017; Plaintiff Taylor in 2015; Plaintiff Torres in late 2016; Plaintiff Yang in 2014. Honda and its authorized dealers withheld information about the Paint Defect even while disclosing other relevant facts to Plaintiffs about the Class Vehicles' white paint, value and residual value, and durability.

295. Honda has not disclosed the truth about the Paint Defect in the Class Vehicles to anyone outside of Honda. Honda has never taken any action to inform consumers about the true nature of the Paint Defect in Class Vehicles. And when consumers brought their Class Vehicles to Honda complaining of the Paint Defect, Honda denied any knowledge of, or responsibility for, the Paint Defect, and in many instances, actually blamed Class Members for causing the problem.

296. *Where*: Honda concealed material information regarding the true nature of the Paint Defect in every communication it had with Plaintiffs and Class members, including at Honda's authorized dealerships, and made incomplete representations about the quality and durability of the Class Vehicles. Plaintiffs are aware of no

document, communication, or other place or thing in which Honda disclosed the truth about the Paint Defect in the Class Vehicles to anyone outside of Honda. Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, owner's manual, or on Honda's website.

297. *How*: Honda concealed the Paint Defect from Plaintiffs and Class Members and made representations about the quality and durability of the Class Vehicles. Honda actively concealed the truth about the existence and nature of the Paint Defect from Plaintiffs and Class members at all times, even though it knew about the Paint Defect and knew that information about the Paint Defect would be important to a reasonable consumer, and Honda promised in its marketing materials that the Class Vehicles have qualities that they do not have.

298. *Why*: Honda actively concealed material information about the Paint Defect in Class Vehicles for the purpose of inducing Plaintiffs and Class members to purchase Class Vehicles, rather than purchasing or leasing competitors' vehicles and made representations about the quality and durability of the Class Vehicles.

299. Honda also actively concealed and failed to disclose the Paint Defect, despite a duty to do so, to reduced costs by implementing an inferior painting process, to earn additional revenue, to induce substantial purchases by unsuspecting consumers, to prevent a steep decline or total cessation in sales, to greatly inflate profits, and to avoid tens of millions of dollars of exposure and liability. Had Honda disclosed the truth, for example in its advertisements or other materials or communications, Plaintiffs (and reasonable consumers) would have been aware of it, and would not have bought the Class Vehicles or would have paid less for them.

### I. Tolling of the Statute of Limitations

300. *Fraudulent Concealment Tolling*: Honda has known of the Paint Defect in the Class Vehicles since at least late 2012, and has concealed from, or failed to, notify Plaintiffs, Class members, and the public of the full and complete nature of the Paint Defect, even when directly asked about it by Plaintiffs and Class members during

communications with Honda, Honda/Acura Customer Relations, Honda/Acura dealerships, and Honda service centers. Honda continues to conceal the Paint Defect to this day,

301. Any applicable statute of limitation has been tolled by Honda's knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

302. *Estoppel*: Honda was, and is, under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the Class Vehicles. Honda actively concealed – and continues to conceal – the true character, quality, and nature of the Class Vehicles and knowingly made representations about the quality and durability of the Class Vehicles. Plaintiffs and Class members reasonably relied upon Honda's knowing and affirmative representations and/or active concealment of these facts during the relevant period and when and after receiving inadequate repairs of paint peeling, flaking, and delaminating attributable to the Paint Defect from Honda without Honda adequately disclosing the nature and extent of the Paint Defect. Based on the foregoing, Honda is estopped from relying on any statutes of limitation in defense of this action.

303. *Discovery Rule*: The causes of action alleged herein did not accrue until Plaintiffs and Class members discovered that their Class Vehicles suffered from the Paint Defect.

304. The Paint Defect existed when the Class Vehicles were manufactured and sold. However, Plaintiffs and Class members had no realistic ability to discern that the Class Vehicles were defective until – at the earliest – after the Paint Defect caused their Class Vehicles' paint to prematurely fail, bubble, peel, delaminate, and flake during the reasonably expected life of the Class Vehicle. Even then, Plaintiffs and Class members had no reason to know the peeling, flaking, and bubbling were caused by a defect in the Class Vehicles because of Honda's active concealment of the Paint Defect.

305. Moreover, Class members had no reasonable basis to conclude that their

Class Vehicles suffered from a Paint Defect after Honda inadequately repaired their Class Vehicles' paint peeling, flaking, bubbling, and delaminating and represented that the repairs had corrected the paint problem, without disclosing any information regarding the true nature and extent of the Paint Defect. Class members had no realistic ability to discern that initial repairs of paint peeling, flaking, and bubbling were inadequate and had no reasonable basis to further investigate the potential for a Paint Defect beyond a reasonably diligent inspection of Honda's initial paint repair. Not only did Honda fail to notify Plaintiffs or Class members about the Paint Defect, Honda, in fact, denied any knowledge of, or responsibility for, the Paint Defect when directly asked about it, and, in many instances, blamed the owner for causing the problem.

306. Thus, Plaintiffs and Class members were not reasonably able to discover the Paint Defect until after they had purchased the Class Vehicles or had their Class Vehicles inadequately repaired, despite their exercise of due diligence, and their causes of action did not accrue until, at earliest, they discovered that the Paint Defect caused their Class Vehicles' paint to prematurely fail, bubble, peel, delaminate, and flake during the reasonably expected life of the Class Vehicle.

## CLASS ACTION ALLEGATIONS

307. Plaintiffs seek to represent and certify the following state Classes:

**California**
All persons or entities that purchased or leased a Class Vehicle in California.

**Georgia**
All persons or entities that purchased or leased a Class Vehicle in Georgia.

**Illinois**
All persons or entities that purchased or leased a Class Vehicle in Illinois.

**Indiana**

All persons or entities that purchased or leased a Class Vehicle in Indiana.

**Kentucky**

All persons or entities that purchased or leased a Class Vehicle in Kentucky.

**Minnesota**

All persons or entities that purchased or leased a Class Vehicle in Minnesota.

**Missouri**

All persons or entities that purchased or leased a Class Vehicle in Missouri.

**North Carolina**

All persons and entities who purchased or leased a Class Vehicle in North Carolina

**South Carolina**

All persons and entities who purchased or leased a Class Vehicle in South Carolina

**Texas**

All persons and entities who purchased or leased a Class Vehicle in Texas.

**Virginia**

All persons and entities who purchased or leased a Class Vehicle in Virginia.

**Washington**

All persons and entities who purchased or leased a Class Vehicle in Washington.

**Wisconsin**

All persons and entities who purchased or leased a Class Vehicle in Wisconsin.[26]

---

[26] Plaintiffs Torres seeks to represent the California Class; The Bowerman Plaintiffs seek to represent the Georgia Class; Ms. Taylor seeks to represent the Illinois Class; Ms. Galbraith seeks to represent the Indiana Class; the Biven Plaintiffs seek to represent the Kentucky Class; the Novack Plaintiffs seek to represent the Minnesota Class; Mr. Hrabovsky seeks to represent the Missouri Class; Ms. Attika seeks to

308. The Classes exclude any judge or magistrate assigned to this case, Honda, Honda's officers, directors, legal representatives, successors, and assigns, and any entity in which Honda has a controlling interest.

309. Plaintiffs satisfy the requirements of Rule 23(a) and Rule 23(b).

310. *Numerosity*: This proposed class action involves at least tens of thousands of Class Vehicles. Although the exact numbers are unknown to Plaintiffs, the number of individuals in each Class far exceeds forty (40) individuals and very likely amounts to thousands of individuals. As a result, the Classes are so numerous that joinder of all members is impracticable.

311. The proposed classes are defined by objective criteria so that it is administratively feasible for the Court to determine whether a particular individual is a member. Individual class members can be identified through affidavits and/or reference to documents in Honda's possession, custody, or control without resort to a mini-hearing on the merits.

312. *Commonality*: The questions of law and fact common to Classes predominate over any questions which may affect individual members of those Classes and include:

a. Whether the Class Vehicles suffer from a latent Paint Defect;

b. When and how Honda knew or suspected the Class Vehicles had a latent Paint Defect;

c. Whether Honda adequately disclosed the Paint Defect to Plaintiffs and Class Members;

d. Whether Honda made false and/or misleading statements and omissions concerning the Class Vehicles and the Paint Defect;

e. Whether Honda's conduct offended public policy without providing

---

represent the North Carolina Class; Mr. Parvin seeks to represent the South Carolina Class; Mr. Yang seeks to represent the Texas Class; Ms. Gimenez-Picou seeks to represent the Virginia Class; Ms. Radigan seeks to represent the Washington Class; and Ms. Beaton seeks to represent the Wisconsin Class.

any countervailing benefits; and

f. Whether Plaintiffs and the Class are entitled to actual and compensatory damages, restitution, and statutory damages.

313. *Typicality*: Plaintiffs' claims are typical of those belonging to members of the Classes. Each Plaintiff purchased or leased Class Vehicles with the latent Paint Defect and suffered economic damages as a result.

314. *Adequacy*: Plaintiffs will fairly and adequately protect the interests of Classes. Plaintiffs have retained counsel experienced in complex class action litigation, and Plaintiffs and their chosen counsel have no interests adverse to those of the Classes.

*Rule 23(b)(1)*

315. Class action status is warranted under Rule 23(b)(1)(A). Prosecuting separate actions by or against individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes, which would establish incompatible standards of conduct for Honda.

316. Class action status is also warranted under Rule 23(b)(1)(B). Prosecuting separate actions by individual members of the Classes would create a risk of adjudications with respect to individual class members which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.

*Rule 23(b)(2) – Declaratory Relief*

317. Rule 23(b)(2) of the Federal Rules of Civil Procedure: Honda has acted or refused to act on grounds generally applicable to Plaintiffs and Class members, thereby making appropriate declaratory relief, with respect to each Class as a whole.

*Rule 23(b)(3) – Superiority*

318. Common questions of law and fact exist as to every member of the Classes and predominate over any questions solely affecting individual members of the Classes, including the common questions identified above paragraph 278, supra.

319. A class action is also superior to other available means for the fair and

efficient adjudication of this controversy for other reasons. The injuries suffered by individual members of the classes, though important to them, are relatively small compared to the burden and expense of individual prosecution needed to address Honda's misconduct. Individualized litigation presents a potential for inconsistent or contradictory judgments. In contrast, a class action presents far fewer management difficulties; allows the hearing of claims that might otherwise go unaddressed; and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Individual class member's interests in individually controlling the prosecution of separate actions are outweighed by their interest in efficient resolution by a single class action, and it would be desirable to concentrate in this single venue the litigation of all class members who were induced to purchase and use the vehicles with the Paint Defect contaminated Products and were damaged by Honda's uniform misconduct.

320. Plaintiffs cannot be certain of the form and manner of proposed notice to members of the Classes until the Classes are finally defined and discovery is completed regarding the identity of class members. Plaintiffs anticipate, however, that notice by mail will be given to members of the Classes who can be identified specifically. In addition, notice may be published in appropriate publications, on the internet, in press releases and in similar communications to reach members of the Classes.

321. Plaintiffs reserve their right to modify or amend the definition of the proposed Classes and to assert additional subclasses at any time before the Classes are certified by the Court.

## FIRST CLAIM FOR RELIEF
## VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW (CAL. BUS. AND PROF. CODE §§ 17200 *et seq.*)

322. Plaintiffs reallege and incorporate by reference the allegations elsewhere in the Complaint as if set forth fully herein.

323. Ms. Torres brings this claim on behalf of herself and the California Class pursuant to California law because Ms. Torres purchased her Class Vehicle in

California.

324. California Business and Professions Code §§ 17200 et seq., prohibits acts of unfair competition, including any "unlawful, unfair or fraudulent business act or practice."

325. Honda engaged in unlawful business acts and practices in violation of California Business and Professions Code §§ 17200 et seq., by engaging in the false and misleading advertising specified elsewhere in this Complaint:

*Unlawful Business Practices*

326. By proscribing "any unlawful" business practice, the UCL borrows violations of other laws and treats them as unlawful practices that the UCL makes independently actionable. The acts, omissions, misrepresentations, practices, and non-disclosures of Honda as alleged herein constitute "unlawful" business acts and practices in that Honda's conduct violates (at least):

- California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 et seq.;
- California's Consumer Legal Remedies Act, Cal. Civ. Code § 1750 et seq.; and

*Unfair Business Practices*

327. California Business and Professions Code §§ 17200 et seq., prohibits acts of unfair competition. Unfair competition includes (a) conduct tethered to any underlying constitutional, statutory or regulatory provision; (b) conduct that offends public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers; or (c) conduct with an injurious impact on the victim that outweighs the reasons, justifications and motives of the alleged wrongdoer.

328. Here, Honda's misconduct violates the "unfair" prong of the UCL. Honda knew of and consciously disregarded or downplayed and falsely minimized the readily foreseeable risk that the Class Vehicles paint would fail, peel, delaminate, or flake as a result of the Paint Defect.

329. By ignoring those risks, Honda manufactured and placed into the stream of commerce tens or hundreds of thousands of Class Vehicles with the latent Paint Defect. Moreover, Honda misrepresented and omitted material information regarding the Class Vehicles' design, aesthetic, value, and durability without indicating to consumers in any way that the Class Vehicle would almost certainly experience the Paint Defect.

330. Honda's misconduct caused consumers, including Plaintiffs, to buy overpriced Class Vehicles and suffer other economic losses described above.

331. Honda's misconduct was tethered to underlying statutory and regulatory violations; offended publicly; and was unfair and substantially injurious to Plaintiffs and the Class. Honda's misconduct is not outweighed by any countervailing benefits to consumers or competition, and Plaintiffs and the Class suffered injuries that could not be avoided because of Honda's subterfuge.

*Fraudulent Business Acts or Practices*

332. California Business and Professions Code §§ 17200 et seq., prohibits fraudulent business acts or practices.

333. The UCL prohibits fraudulent and misleading business acts and practices and business acts or practices that although technically true either mislead or which have a capacity, likelihood, or tendency to deceive or confuse the public.

334. The UCL also prohibits omissions/non-disclosures that are contrary to representations actually made or omissions/non-disclosures that a Honda had a duty to disclose, including in instances where (a) the defendant is in a fiduciary relationship with the plaintiff; (b) when the defendant has exclusive knowledge of material facts not known to the plaintiff; (c) when the defendant actively conceals a material fact from the plaintiff; and (d) when the defendant makes partial representations but also suppresses some material facts.

335. Here, the false and misleading advertising of the Class Vehicles, as alleged herein, constitutes "fraudulent" business acts and practices because members of the

consuming public, including Plaintiffs and the Class were deceived by the false and misleading advertising described elsewhere in the Complaint.

336. At least as early as the beginning of the relevant time (late 2012), Honda understood the unreasonable risk that the Class Vehicles' paint would fail due to the Paint Defect due to internal testing, prior TBSs, consumer complaints, and at least one other lawsuit. Despite that knowledge and Honda's duty to disclose the Paint Defect, it did not reveal the truth to Plaintiffs and other Class members.

337. At least as early as the beginning of the relevant time, Honda consciously ignored those risks and/or intentionally and fraudulently downplayed and falsely minimized those risks to reduce costs, induce substantial purchases by unsuspecting consumers, prevent a steep decline or total cessation in sales, greatly inflate profits, and avoid tens of millions of dollars of exposure and liability once the truth was revealed.

338. During the relevant times, Honda represented through an extensive nationwide advertising campaign that the Class Vehicles were high-value, value-retaining, luxurious and stylish, durable, and high-quality vehicles. Those representations were false and or misleading because, during the relevant time, the Class Vehicles suffered from the latent Paint Defect which would and will inevitably cause paint failure, peeling, delaminating, and flaking.

339. Honda's omissions/non-disclosures are also material and actionable under the UCL based on Honda's duty to disclose the Paint Defect. Honda's omissions were contrary to representations already made or Honda had a duty to disclose the Paint Defect because: (a) Honda had exclusive and superior knowledge of those Paint Defect not known to Plaintiffs; (b) Honda actively concealed those risks from Plaintiffs; and (c) Honda makes partial representations regarding the Class Vehicles while suppressing facts concerning the Class Vehicles' Paint Defect. Honda's omissions/non-disclosures were material because they related to Class Vehicles integral function, design, purposes, and safety.

340. Honda leveraged its deception to induce Plaintiffs and the Class to

purchase Class Vehicles that were of lesser value and quality than advertised. Plaintiffs and the Class reviewed and relied on Honda's representations and omissions and were denied the benefit of the bargain when they decided to purchase the Class Vehicles over competitor vehicles which did not have the Paint Defect. Had Honda not made false and misleading statements and used false and misleading advertising tactics, Plaintiffs and the Class would have paid far less than what they did for the Class Vehicles or would not have purchased the Class Vehicles at all, among other economic injuries.

341. The foregoing acts and practices have detrimentally impacted competition and caused substantial harm to Plaintiffs, the Class, and the consuming public. Plaintiffs and Class members were misled and suffered injuries and lost money or property as a direct and proximate result of Handa's unlawful business practices.

342. By reason of the foregoing, Honda should be required to disgorge its illicit profits, make restitution to Plaintiffs and the Class, and pay for Plaintiffs' and the Class's attorneys' fees.

Plaintiffs reserve the right to identify additional provisions of law violated by Honda as further investigation and discovery warrants.

## **SECOND CLAIM FOR RELIEF**
## **VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW (CAL. BUS. AND PROF. CODE §§ 17500 *et seq.*)**

343. Plaintiffs reallege and incorporate by reference the allegations elsewhere in the Complaint as if set forth fully herein.

344. Ms. Torres brings this claim on behalf of herself and the California Class pursuant to California law because Ms. Torres purchased her Class Vehicle in California.

345. The FAL prohibits any "unfair, deceptive, untrue, or misleading advertising." Cal. Bus. and Prof. Code § 17500. The FAL prohibits not only advertising which is false, but also advertising which, although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.

346. Honda's acts and practices as described herein have deceived and/or are likely to deceive Plaintiffs, the Class, and the public. During the relevant time, Honda engaged in a widespread national advertising campaign misrepresenting that the Class Vehicles were high-value, value-retaining, luxurious and stylish, durable, and high-quality vehicles even though the Class Vehicles suffered from a latent Paint Defect that would inevitably cause paint failure, peeling, delaminating, and flaking.

347. Furthermore, at least as early as the beginning of the relevant time, Honda understood the unreasonable risk that the Class Vehicles' paint would fail due to the Paint Defect due to internal testing, prior TBSs, consumer complaints, and at least one other lawsuit. Despite that knowledge and Honda's duty to disclose the Paint Defect, it did not reveal the truth to Plaintiffs and other Class members although the Paint Defect relates to each Class Vehicles' central function and safety. The advertisements, labeling, policies, acts, and practices described herein were designed to, and did, result in the purchase and lease of the Class Vehicles without knowledge of the Paint Defect.

348. The misrepresentations and omissions by Honda of the material facts detailed elsewhere in this Complaint constitute false and misleading advertising. Plaintiffs and the Class reviewed and relied on Honda's representations and omissions and were denied the benefit of the bargain when they decided to purchase the Class Vehicles over competitor vehicles which do not include the Paint Defect. Had Honda not made false and misleading statements and used false and misleading advertising tactics, Plaintiffs and the Class would have paid far less than what they did for the Class Vehicles or would not have purchased the Products at all, among other economic injuries.

349. By reason of the foregoing, Honda should be required to disgorge its illicit profits, make restitution to Plaintiffs and Class, and pay for Plaintiffs' and the Class's attorneys' fees.

**THIRD CLAIM FOR RELIEF**

**VIOLATION OF THE CONSUMERS LEGAL REMEDIES ACT (CAL. CIV. CODE §§ 1750 *et seq.*)**

350. Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

351. Ms. Torres brings this claim on behalf of herself and the California Class pursuant to California law because Ms. Torres purchased her Class Vehicle in California.

352. The CLRA has adopted a statutory scheme prohibiting various deceptive practices in connection with the conduct of a business providing goods, property, or services primarily for personal, family, or household purposes, including failing to disclose material information regarding latent defects that relate to a product's central function and safety.

353. Honda's policies, acts, and practices were intended to, and did, result in the purchase and use of the products primarily for personal, family, or household purposes, and violated and continue to violate at least the following sections of the CLRA:

- § 1770(a)(5): which proscribes "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have";
- § 1770(a)(7) which proscribes "[r]epresenting that goods or services are of a particular standard, quality or grade"; and
- § 1770(a)(9): which proscribes "[a]dvertising goods or services with intent not to sell them as advertised."

354. As a proximate result of these violations and omissions by Honda, Plaintiffs and the Class have suffered harm and damages in an amount to be determined at trial.

355. Plaintiffs seek an injunction pursuant to Cal. Civ. Code § 1782(d) enjoining Honda from continuing to employ the unlawful methods, acts, and practices alleged elsewhere in this Complaint, including Honda's continuing pattern and practice

of improperly refusing to repair or paying to repair the Paint Defect. If Honda is not restrained from engaging in these practices in the future, Plaintiffs and the Class will continue to suffer harm.

356. Plaintiffs and the Class are also seeking actual and exemplary damages against Honda for its violation of the CLRA. In addition, pursuant to Cal. Civ. Code § 1780(a)(2), Plaintiffs and the Class seek an Order enjoining the above-described acts and practices and requiring Honda to repair or pay to repair the Paint Defect, providing restitution to Plaintiffs and the Class, ordering payment of costs and attorneys' fees, and any other relief deemed appropriate and proper by the Court pursuant to California Civil Code § 1780.

357. More than 30 days prior to seeking actual damages under the CLRA in this Complaint, Ms. Terri Hernandez, a plaintiff in a related case against Honda arising from the Paint Defect (*Clemmens, et al. v. Am. Honda Motor Co., Inc.*, No. 2:24-cv-09728-ODW(SKx) (C.D. Cal.), sent a letter to Honda by certified mail return receipt requested complying with California Civil Code 1782, on behalf of herself and other members of a substantially similar proposed California Class. That notice was dated November 4, 2024 and included a detailed description of Honda's unlawful conduct and demand for relief. Ms. Hernandez notified Honda about the statutory claims asserted under the CLRA and provided demands to resolve those claims. Honda has failed and refused to provide the relief demanded therein in accordance with the CLRA.

## <u>FOURTH CLAIM FOR RELIEF</u>

## VIOLATION OF THE GEORGIA FAIR BUSINESS PRACTICES ACT (O.C.G.A. 10-1-390 *et seq.*)

358. Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

359. The Bowerman Plaintiffs bring this claim on behalf of themselves and the proposed Georgia Class pursuant to Georgia law because they purchased their Class Vehicle in Georgia.

360. The purpose of the Georgia Fair Business Practices Act ("GFBPA") is "to

protect consumers . . . from unfair or deceptive practices in the conduct of any trade or commerce in part or wholly in the state." O.C.G.A. § 10-1-391(a).

361. The GFBPA declares unlawful "[u]nfair or deceptive acts or practices in the conduct of consumer transactions," including "[r]epresent[ing] that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresent[ing] that goods or services are of a particular standard, quality, or grade," [a]dvertis[ing] goods or services with intent not to sell them as advertised," and "[e]ngag[ing] in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." O.C.G.A. §§ 10-1-393(b)(5), (7), (9), (12).

362. In the course of its business, Honda violated the GFBPA by knowingly misrepresenting and intentionally concealing material facts regarding the quality of the Class Vehicles and the quality and benefits of the paint and paint process used on the Class Vehicles, as detailed above. Specifically, in marketing, offering for sale/lease, and selling/leasing the defective Class Vehicles, Honda engaged in one or more of the following unfair or deceptive acts or practices which are proscribed by the GFBPA:

- representing that the Class Vehicles have characteristics or benefits that they do not have;
- representing that the Class Vehicles are of a particular standard and quality when they are not;
- advertising the Class Vehicles with the intent not to sell them as advertised; and/or;
- Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding.

363. Honda's scheme and concealment of the true characteristics of the Class Vehicles were material to the Bowerman Plaintiffs and the Georgia Class members, and Honda misrepresented, concealed, or failed to disclose the truth with the intention that the Bowerman Plaintiffs and the Georgia Class members would rely on the misrepresentations, concealments, and omissions. Had they known the truth, the

Bowerman Plaintiffs and the Georgia Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

364. The Bowerman Plaintiffs and the Georgia Class members had no way of discerning that Honda's representations were false and misleading, or otherwise learning the facts that Honda had concealed or failed to disclose.

365. Honda had an ongoing duty to the Bowerman Plaintiffs and the Georgia Class members to refrain from unfair and deceptive practices under the GFBPA in the course of its business. Specifically, Honda owed the Bowerman Plaintiffs and the Georgia Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from the Bowerman Plaintiffs and the Georgia Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

366. The Bowerman Plaintiffs and the Georgia Class members suffered ascertainable loss and actual damages as a direct and proximate result of Honda's concealment, misrepresentations, and/or failure to disclose material information.

367. Plaintiffs and the members of the Georgia Class are entitled to recover damages and exemplary damages (for intentional violations) pursuant to O.C.G.A. § 10-1-399(a).

368. Plaintiffs also seek an order enjoining Honda's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under O.C.G.A. § 10-1-399.

369. More than 30 days prior to this filing, the Bowerman Plaintiffs sent a letter by email and certified mail return receipt requested to Honda's counsel complying with Ga. Code. Ann. § 10-1-399(b), on behalf of themselves and the other members of the proposed Georgia Class. That notice was dated December 23, 2024 and included a detailed description of Defendant's unlawful conduct, and a demand for relief. The Bowerman Plaintiffs notified Defendant about the statutory claims asserted in this

Complaint and provided demands to resolve those claims. Defendant has failed and refused to provide the relief demanded therein in accordance with the GFBPA.

## FIFTH CLAIM FOR RELIEF
## VIOLATION OF THE GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT
## (O.C.G.A. 10-1-370, *et seq.*)

370. Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

371. The Bowerman Plaintiffs bring this claim on behalf of themselves and the proposed Georgia Class pursuant to Georgia law because they purchased their Class Vehicle in Georgia.

372. Honda, the Bowerman Plaintiffs, and the Georgia Class members are "persons" within the meaning of the Georgia Uniform Deceptive Trade Practices Act ("GUDTPA"), GA. CODE ANN. §10-1-371(5).

373. The GUDTPA provides that it is a deceptive trade practice for a person or entity to engage in any of twelve types of conduct, including by:

- "[r]epresent[ing] that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have," O.C.G.A. § 10-1-372(a)(5);
- "[r]epresent[ing] that goods or services are of a particular standard, quality, or grade or that goods are of a particular style or model, if they are of another," O.C.G.A. § 10-1-372(a)(7);
- "[a]dvertis[ing] goods or services with intent not to sell them as advertised," O.C.G.A. § 10-1-372(a)(9); and
- "[e]ngag[ing] in any other conduct which similarly creates a likelihood of confusion or of misunderstanding," O.C.G.A. § 10-1-372(a)(12).

374. In the course of its business, Honda violated the GUDTPA by knowingly misrepresenting and intentionally concealing material facts regarding the quality of the

Class Vehicles and the quality and benefits of the paint and paint process used on the Class Vehicles, as detailed above. Specifically, in marketing, offering for sale/lease, and selling/leasing the defective Class Vehicles, Honda engaged in one or more of the following unfair or deceptive acts or practices which are proscribed by the GUDTPA:

- representing that the Class Vehicles have characteristics or benefits that they do not have;
- representing that the Class Vehicles are of a particular standard and quality when they are not;
- advertising the Class Vehicles with the intent not to sell them as advertised; and/or;
- Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding.

375. The Bowerman Plaintiffs and the Georgia Class members have suffered monetary and non-monetary losses as a result of Honda's conduct in violation of the GUDTPA, and they will continue to suffer harm until such time as an injunction is granted prohibiting Defendants from further violating the GUDTPA.

376. Plaintiffs and the Class seek a judicial declaration that Honda has violated the GUDPTA, as well as an injunction prohibiting Honda from engaging in the conduct giving rise to this claim, and requiring Honda to repair or pay to repair Georgia Class members' Paint Defect.

## <u>SIXTH CLAIM</u>
## VIOLATION OF THE ILLINOIS CONSUMER FRAUD ACT
## (815 ILCS 505/1 et seq.)

377. Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

378. Plaintiff Taylor brings this claim on behalf of himself and the proposed Illinois Class pursuant to Illinois law because she purchased her Class Vehicle in Kentucky.

379. Honda, Ms. Taylor, and the Illinois Class members are "persons" within the meaning 815 Ill. Comp. Stat. 505/1(c) and 510/1(5).

380. Ms. Taylor and the Illinois Class members are "consumers" within the meaning of 815 Ill. Comp. Stat.505/1(e).

381. The Illinois Consumer Fraud and Deceptive Practices Act ("Illinois CFA") makes unlawful "unfair or deceptive acts or practices, including, but not limited to, the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby." 815 Ill. Comp. Stat. 505/2. The Illinois CFA further makes unlawful deceptive trade practices undertaken in the course of business. 815 Ill. Comp. Stat. 510/2.

382. In the course of its business, Honda violated the Illinois CFA by knowingly misrepresenting and intentionally concealing material facts regarding the quality of the Class Vehicles and the availability, quality, and benefits of white paint and paint process used on the Class Vehicles, as detailed above. Specifically, in marketing, offering for sale/lease, and selling/leasing the defective Class Vehicles, Honda engaged in one or more of the following unfair or deceptive acts or practices which are proscribed by the Illinois CFA:

- representing that the Class Vehicles have characteristics or benefits that they do not have;
- representing that the Class Vehicles are of a particular standard and quality when they are not;
- advertising the Class Vehicles with the intent not to sell them as advertised; and/or;
- Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding; and/or
- Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the advertisement and sale or lease of the Class Vehicles.

383. Honda's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiff Taylor and the Illinois Class, and Honda misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff Taylor and the Illinois Class members would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Plaintiff Taylor and the Illinois Class members would not have purchased or leased the Class Vehicles, would have paid significantly less for them, or would have purchased the Class Vehicles in alternative colors.

384. Plaintiff Taylor and the Illinois Class members had no way of discerning that Honda's representations were false and misleading, or otherwise learning the facts that Honda had concealed or failed to disclose.

385. Honda had an ongoing duty to Plaintiff Taylor and the Illinois Class members to refrain from unfair and deceptive practices under the Illinois CFA during its business. Specifically, Honda owed Plaintiff Taylor and the Illinois Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from Plaintiff Taylor and the Illinois Class, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

386. Plaintiff Taylor and the Illinois Class members suffered ascertainable loss and actual damages as a direct and proximate result of Honda's concealment, misrepresentations, and/or failure to disclose material information.

387. Pursuant to 815 Ill. Comp. Stat. 505/10a(a) and 510/3, the Illinois Class members seek an order awarding damages, punitive damages, and any other just and proper relief available under the Illinois CFA

**SEVENTH CLAIM**

**VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT**

**(IND. CODE § 24-5-0.5-1, *et seq.*)**

388. Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

389. Ms. Galbraith brings this claim on behalf of herself and the proposed Indiana Class pursuant to Indiana law because she purchased her Class Vehicle in Indiana.

390. Defendant Honda is a "supplier," Ms. Galbraith and the Indiana Class members are "consumers," and the purchase and lease of the Class Vehicles constitute "consumer transactions" within the meaning of the Indiana Deceptive Consumer Sales Act ("IDCSA"). Ind. Code. § 24-5-0.5-2.

391. The IDCSA prohibits suppliers from committing A supplier may not commit an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction, including by (without limitation):

- representing the "subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have." Ind. Code. § 24-5-0.5-3 (1);
- representing subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not." Ind. Code. § 24-5-0.5-3 (2);

392. In the course of its business, Honda violated the IDSCA by knowingly misrepresenting and intentionally concealing material facts regarding the quality of the Class Vehicles and the quality and benefits of the paint and paint process used on the Class Vehicles, as detailed above. Specifically, in marketing, offering for sale/lease, and selling/leasing the defective Class Vehicles, Honda engaged in one or more of the following unfair or deceptive acts or practices which are proscribed by the IDCSA:

- representing that the Class Vehicles have characteristics or benefits that they do not have;
- representing that the Class Vehicles are of a particular standard and quality when they are not;
- advertising the Class Vehicles with the intent not to sell them as advertised; and/or;

- Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding; and/or
- Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the advertisement and sale or lease of the Class Vehicles.

393. Honda's scheme and concealment of the true characteristics, quality, and durability of the Class Vehicles were material to Plaintiff Ms. Galbraith and the Indiana Class members. Honda knowingly misrepresented and omitted material facts with the intent that Ms. Galbraith and the Indiana Class members would rely on those misrepresentations and omissions in connection with their purchases or leases of the Class Vehicles. Had they known the true facts, Ms. Galbraith and the Indiana Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

394. Ms. Galbraith and the Indiana Class members had no way of discerning that Honda's representations were false and misleading, or otherwise learning the facts that Honda had concealed or failed to disclose.

395. Honda had an ongoing duty to Ms. Galbraith and the Indiana Class members to refrain from unfair and deceptive practices under the IDCSA in the course of its business. Specifically, Honda owed the Ms. Galbraith and the Indiana Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from the Ms. Galbraith and the Indiana Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts

396. Honda's deceptive conduct as alleged herein constitutes incurable deceptive acts within the meaning of the IDCSA because such conduct was undertaken as part of a scheme, artifice, or device with intent to defraud or mislead consumers. Honda knew, prior to sale, that the Class Vehicles were impacted by the Paint Defect, yet deliberately concealed and omitted to disclose that defect and continued to market and sell the Class

Vehicles as possessing superior quality, durability, and value. Honda's conduct was not correctable through a post-sale cure and was directed broadly at consumers, including Ms. Galbraith and the Indiana Class.

397. As a direct and proximate result of Honda's deceptive acts, Ms. Galbraith and the Indiana Class members suffered ascertainable losses, including but not limited to overpayment for the Class Vehicles, diminished value, and costs associated with diagnosing and repairing the Paint Defect.

398. Ms. Galbraith and the Indiana Class seek all available relief under the IDCSA, including actual damages, treble damages as permitted by law, attorneys' fees, and all other relief the Court deems just and proper. Ind. Code. § 24-5-0.5-4.

## EIGHTH CLAIM

## VIOLATION OF THE KENTUCKY CONSUMER PROTECTION ACT (KY. REV. STAT. §367.110, *et seq.*)

399. Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

400. The Biven Plaintiffs brings this claim on behalf of themselves and the proposed Kentucky Class pursuant to Kentucky law because they purchased their Class Vehicle in Kentucky.

401. Honda, the Biven Plaintiffs, and the Kentucky Class members are "persons" within the meaning of Ky. Rev. Stat. § 367.110(1).

402. Honda is engaged in "trade" or "commerce" within the meaning of Ky. Rev. Stat. § 367.110(2).

403. The Class Vehicles are "goods" within the meaning of Ky. Rev. Stat. § 367.110(1).

404. The Kentucky Consumer Protection Act ("Kentucky CPA") makes unlawful "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Ky. Rev. Stat. § 367.170(1).

405. In the course of its business, Honda violated the Kentucky CPA by knowingly misrepresenting and intentionally concealing material facts regarding the

quality of the Class Vehicles and the availability, quality, and benefits of white paint and paint process used on the Class Vehicles, as detailed above. Specifically, in marketing, offering for sale/lease, and selling/leasing the defective Class Vehicles, Honda engaged in one or more of the following unfair or deceptive acts or practices which are proscribed by the Kentucky CPA:

- representing that the Class Vehicles have characteristics or benefits that they do not have;
- representing that the Class Vehicles are of a particular standard and quality when they are not;
- advertising the Class Vehicles with the intent not to sell them as advertised; and/or;
- Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding; and/or
- Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the advertisement and sale or lease of the Class Vehicles.

406. Honda's scheme and concealment of the true characteristics of the Class Vehicles were material to the Biven Plaintiffs and the Kentucky Class, and Honda misrepresented, concealed, or failed to disclose the truth with the intention that the Biven Plaintiffs and the Kentucky Class members would rely on the misrepresentations, concealments, and omissions. Had they known the truth, the Biven Plaintiffs and the Kentucky Class members would not have purchased or leased the Class Vehicles, would have paid significantly less for them, or would have purchased the Class Vehicles in alternative colors.

407. The Biven Plaintiffs and the Kentucky Class members had no way of discerning that Honda's representations were false and misleading, or otherwise learning the facts that Honda had concealed or failed to disclose.

408. Honda had an ongoing duty to the Biven Plaintiffs and the Kentucky Class members to refrain from unfair and deceptive practices under the Kentucky CFA

during its business. Specifically, Honda owed the Biven Plaintiffs and the Kentucky Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from the Biven Plaintiffs and the Kentucky Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

409. The Biven Plaintiffs and the Kentucky Class members suffered ascertainable loss and actual damages as a direct and proximate result of Honda's concealment, misrepresentations, and/or failure to disclose material information.

410. Pursuant to Ky. Rev. Stat. §367.220, the Biven Plaintiffs the Kentucky Class members seek an order awarding damages, punitive damages, and any other just and proper relief available under the Kentucky CPA.

## NINTH CLAIM FOR RELIEF
## VIOLATION OF MINNESOTA PREVENTION OF CONSUMER FRAUD ACT
## (MINN. STAT. §325F.68, *et seq.*)

411. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

412. This Count is brought by the Novack Plaintiffs on behalf of the Minnesota Class under Minnesota law because the Novack Plaintiffs purchased their Class Vehicle in Minnesota.

413. Honda, the Novack Plaintiffs, and the Minnesota Class members are "persons" within the meaning of Minn. Stat. §325F.68(3). The Class Vehicles are "merchandise" within the meaning of Minn. Stat. §325F.68(2).

414. The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby." Minn. Stat.

§325F.69(1)

415. In the course of its business, Honda violated the Minnesota CFA by knowingly misrepresenting and intentionally concealing material facts regarding the quality of the Class Vehicles and the quality and benefits of the paint and paint process used on the Class Vehicles, as detailed above. Specifically, in marketing, offering for sale/lease, and selling/leasing the defective Class Vehicles, Honda engaged in one or more of the following unfair or deceptive acts or practices which are proscribed by the Minnesota CFA:

- representing that the Class Vehicles have characteristics or benefits that they do not have;
- representing that the Class Vehicles are of a particular standard and quality when they are not;
- advertising the Class Vehicles with the intent not to sell them as advertised; and/or;
- Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding; and/or
- Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the advertisement and sale or lease of the Class Vehicles.

416. Honda's scheme and concealment of the true characteristics of the Class Vehicles were material to the Novack Plaintiffs and the Minnesota Class members, and Honda misrepresented, concealed, or failed to disclose the truth with the intention that the Novack Plaintiffs and the Minnesota Class members would rely on the misrepresentations, concealments, and omissions. Had they known the truth, the Novack Plaintiffs and the Minnesota Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

417. The Novack Plaintiffs and the Minnesota Class members had no way of discerning that Honda's representations were false and misleading, or otherwise learning the facts that Honda had concealed or failed to disclose.

418. Honda had an ongoing duty to the Novack Plaintiffs and the Minnesota Class members to refrain from unfair and deceptive practices under the Minnesota CFA in the course of its business. Specifically, Honda owed the Novack Plaintiffs and the Minnesota Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from the Novack Plaintiffs and the Minnesota Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

419. The Novack Plaintiffs bring their Minnesota statutory consumer protection claims to vindicate important public rights and confer a significant benefit on the public through this case, not merely to redress private injuries.

420. Honda's conduct as alleged herein impacts the public at large, including thousands of consumers in Minnesota and nationwide, and is not limited to a single transaction or isolated dispute. Honda has engaged in a uniform course of conduct involving the design, manufacture, marketing, and sale of Class Vehicles with a latent Paint Defect, coupled with material omissions regarding the durability, quality, and value of the vehicles' paint.

421. Honda's deceptive practices were directed to the public generally, including Minnesota consumers, through nationwide advertising campaigns, standardized marketing materials, dealership representations, and uniform omissions at the point of sale. These practices were not individualized but, instead, were systematic and designed to induce consumers to purchase or lease Class Vehicles rather than competitor vehicles and at inflated prices.

422. The Novack Plaintiffs and the Minnesota Class members suffered ascertainable loss and actual damages as a direct and proximate result of Honda' concealment, misrepresentations, and/or failure to disclose material information.

423. Pursuant to the Minnesota CFA, and Minn. Stat. §8.31(3a), the Novack Plaintiffs and the Minnesota Class members seek an order awarding damages, treble

damages, and any other just and proper relief available under the Minnesota CFA.

**TENTH CLAIM FOR RELIEF**
**VIOLATION OF MINNESOTA**
**UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**(MINN. STAT. §325F.68, *et seq.*)**

424. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

425. This Count is brought by the Novack Plaintiffs on behalf of the Minnesota Class under Minnesota law because the Novacks purchased their Class Vehicle in Minnesota.

426. Honda, the Novack Plaintiffs, and the Minnesota Class members are "persons" within the meaning of Minn. Stat. §325D.44. The Class Vehicles are "goods" within the meaning of Minn. Stat. §325D.44.

427. The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits deceptive trade practices, which occur when a person: "(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have"; . . . "(7) represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another"; . . . and "(9) advertises goods or services with intent not to sell them as advertised." Minn. Stat. §325D.44.

428. In the course of its business, Honda violated the Minnesota DTPA by knowingly misrepresenting and intentionally concealing material facts regarding the quality of the Class Vehicles and the quality and benefits of the paint and paint process used on the Class Vehicles, as detailed above. Specifically, in marketing, offering for sale/lease, and selling/leasing the defective Class Vehicles, Honda engaged in one or more of the following unfair or deceptive acts or practices which are proscribed by the Minnesota DTPA:

- representing that the Class Vehicles have characteristics or benefits that they do not have;

- representing that the Class Vehicles are of a particular standard and quality when they are not;
- advertising the Class Vehicles with the intent not to sell them as advertised;
- Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding; and/or
- Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the advertisement and sale or lease of the Class Vehicles.

429. Honda's scheme and concealment of the true characteristics of the Class Vehicles were material to the Novack Plaintiffs and the Minnesota Class members, and Honda misrepresented, concealed, or failed to disclose the truth with the intention that the Novack Plaintiffs and the Minnesota Class members would rely on the misrepresentations, concealments, and omissions. Had they known the truth, the Novack Plaintiffs and the Minnesota Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

430. The Novack Plaintiffs and the Minnesota Class members had no way of discerning that Honda's representations were false and misleading, or otherwise learning the facts that Honda had concealed or failed to disclose.

431. Honda had an ongoing duty to the Novack Plaintiffs and the Minnesota Class members to refrain from unfair and deceptive practices under the Minnesota DTPA in the course of its business. Specifically, Honda owed the Novack Plaintiffs and the Minnesota Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from the Novack Plaintiffs and the Minnesota Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

432. The Novack Plaintiffs bring their Minnesota statutory consumer protection claims to vindicate important public rights and confer a significant benefit on the public

through this case, not merely to redress private injuries.

433. Honda's conduct as alleged herein impacts the public at large, including thousands of consumers in Minnesota and nationwide, and is not limited to a single transaction or isolated dispute. Honda has engaged in a uniform course of conduct involving the design, manufacture, marketing, and sale of Class Vehicles with a latent Paint Defect, coupled with material omissions and misrepresentations regarding the durability, quality, and value of the vehicles' paint.

434. Honda's deceptive practices were directed to the public generally, including Minnesota consumers, through nationwide advertising campaigns, standardized marketing materials, dealership representations, and uniform omissions at the point of sale. These practices were not individualized, but rather were systematic and designed to induce consumers to purchase or lease Class Vehicles rather than competitor vehicles and at inflated prices.

435. The Novack Plaintiffs and the Minnesota Class members suffered ascertainable loss and actual damages as a direct and proximate result of Honda's concealment, misrepresentations, and/or failure to disclose material information.

436. Pursuant to Minn. Stat. §§8.31(3a) and 325D.45, the Novack Plaintiffs and the Minnesota Class members seek an Order enjoining the above-described acts and practices and requiring Honda to repair or pay to repair the Paint Defect, providing restitution to Plaintiffs and the Class, ordering payment of costs and attorneys' fees, and any other relief deemed appropriate and proper by the Court.

## ELEVENTH CLAIM FOR RELIEF
## VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT
## (MO. REV. STAT. §407.010, *et seq.*)

437. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

438. This Count is brought by Mr. Hrabovksy on behalf of the Missouri Class under Missouri law because Mr. Hrabovsky purchased his Class Vehicle in Missouri.

439. Honda and the Missouri Class members are "persons" within the meaning

of Mo. Rev. Stat. §407.010(5).

440. The Class Vehicles are "merchandise" within the meaning of Mo. Rev. Stat. §407.010(4).

441. Honda is engaged in "trade" or "commerce" within the meaning of Mo. Rev. Stat. §407.010(7).

442. The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise Mo. Rev. Stat. §407.020.

443. In the course of its business, Honda violated the Missouri MPA by knowingly misrepresenting and intentionally concealing material facts regarding the quality of the Class Vehicles and the availability, quality, and benefits of white paint and paint process used on the Class Vehicles, as detailed above. Specifically, in marketing, offering for sale/lease, and selling/leasing the defective Class Vehicles, Honda engaged in one or more of the following unfair or deceptive acts or practices which are proscribed by the Missouri MPA:

- representing that the Class Vehicles have characteristics or benefits that they do not have;
- representing that the Class Vehicles are of a particular standard and quality when they are not;
- advertising the Class Vehicles with the intent not to sell them as advertised;
- engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding, including failing to disclose the Paint Defect; and/or
- using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the advertisement and sale or lease of the Class Vehicles.

444. Honda's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiff Hrabovsky and Missouri Class members, and Honda misrepresented, concealed, or failed to disclose the truth with the intention that to Plaintiff Hrabovsky and Missouri Class members would rely on the misrepresentations, concealments, and omissions. Had they known the truth Plaintiff Hrabovsky and Missouri Class members would not have purchased or leased the Class Vehicles, would have paid significantly less for them, or would have purchased the Class Vehicles in alternative colors.

445. Plaintiff Hrabovsky and Missouri Class members had no way of discerning that Honda's representations were false and misleading, or otherwise learning the facts that Honda had concealed or failed to disclose.

446. Honda had an ongoing duty to Plaintiff Hrabovsky and Missouri Class members to refrain from unfair and deceptive practices under the Missouri MPA in the course of its business. Specifically, Honda owed Plaintiff Hrabovsky and Missouri Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts Plaintiff Hrabovsky and Missouri Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

447. Plaintiff Hrabovsky and Missouri Class members suffered ascertainable loss and actual damages as a direct and proximate result of Honda's concealment, misrepresentations, and/or failure to disclose material information.

448. Honda is liable to the Missouri Class members for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, and any other just and proper relief under Mo. Rev. Stat. §407.025.

**TWELFTH CLAIM FOR RELIEF**
**VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT**
**(N.C. GEN. STAT. §§ 75-1.1, *et seq.*)**

449. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

450. This Count is brought by Ms. Attika on behalf of the North Carolina Class under North Carolina law because Ms. Attika purchased her Class Vehicle in North Carolina.

451. North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §75-1.1, *et seq*. ("North Carolina UDTPA"), prohibits a person from engaging in "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" The North Carolina UDTPA provides a private right of action for any person injured "by reason of any act or thing done by any other person, firm or corporation in violation of" the North Carolina UDTPA. N.C. Gen. Stat. §75-16.

452. Honda's acts and practices complained of herein were performed in the course of Honda's trade or business and thus occurred in or affected "commerce," as defined in N.C. Gen. Stat. §75-1.1(b).

453. In the course of its business, Honda concealed the Paint Defect in Class Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Accordingly, Honda engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested

state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

454. Honda did not simply manufacture and sell vehicles with a defect. Rather, Defendant engaged in a knowing, systematic, and deceptive course of conduct that was immoral, unethical, oppressive, unscrupulous and substantially injurious to Ms. Attika and the North Carolina Class.

455. Defendant had prior knowledge of the Paint Defect before Plaintiffs' Vehicle purchases through internal testing, prior substantially similar paint failures, Technical Service Bulletins, and widespread consumer complaints.

456. Honda had a duty to disclose the existence of the Paint Defect in the Class Vehicles. By failing to disclose and by actively concealing the Paint Defect in Class Vehicles, by marketing its vehicles as durable and being of high quality, and by presenting itself as a reputable manufacturer that valued quality and stood behind its vehicles after they were sold, Honda engaged in deceptive business practices in violation of the North Carolina UDTPA.

457. Honda's conduct as alleged herein is not limited to a single transaction or isolated dispute. Instead, Honda has engaged in a uniform course of conduct involving the design, manufacture, marketing, and sale of Class Vehicles with a latent Paint Defect, coupled with material omissions and misrepresentations regarding the durability, quality, and value of the vehicles' paint

458. Despite Honda's pre-sale knowledge, and its duty to disclose, Honda and its authorized dealers omitted material information to Ms. Attika and to every North Carolina Class member at the point of every sale for the purpose of reducing costs by implementing an inferior painting process; inducing Plaintiffs and North Carolina Class members to purchase Class Vehicles; to extract additional substantial revenue; and to avoid tens of millions of dollars of exposure and liability.

459. Honda's unfair or deceptive acts or practices were likely to, and did, in fact, deceive reasonable consumers, including Ms. Attika and the North Carolina Class

members, about the quality of the Class Vehicles and Honda brand, and the true value of the Class Vehicles.

460. Honda's deception at the point of sale constitutes egregious or aggravating circumstances supporting a claim under the North Carolina UDTPA.

461. As a direct and proximate result of Honda's violations of the North Carolina UDTPA, Ms. Attika and the North Carolina Class members have suffered injury-in-fact and/or actual damage.

462. Ms. Attika and the North Carolina Class members suffered ascertainable loss caused by Honda's misrepresentations and its failure to disclose material information. Had they been aware of the Paint Defect in the Class Vehicles, Ms. Attika and the North Carolina Class members either would have paid less for their vehicles or would not have purchased or leased them at all. Ms. Attika and the North Carolina Class members did not receive the benefit of their bargain as a result of Honda's misconduct.

463. The repairs offered and instituted by Honda are not adequate.

464. Ms. Attika and the North Carolina Class members seek monetary relief against Honda for actual damages, in addition to treble damages pursuant to N.C. Gen. Stat. §75-16.

465. Ms. Attika and the North Carolina Class members also seek declaratory relief, punitive damages, an order enjoining Honda's unfair, unlawful, and/or deceptive practices, and reasonable attorneys' fees and costs pursuant to N.C. GEN. STAT. §75-16.1, as well as other proper and just relief under the North Carolina UDTPA.

## THIRTEENTH CLAIM FOR RELIEF
## VIOLATION OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT (S.C. CODE ANN. §39-5-10, *et seq.*)

466. Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

467. Plaintiff Parvin brings this claim on behalf of himself and the proposed South Carolina Class pursuant to South Carolina law because he purchased his Class

Vehicle in South Carolina.

468. Honda, Plaintiff Parvin, and the South Carolina Class members are "persons" under S.C. Code Ann. §39-5-10.

469. The sale or lease of the Class Vehicles is within the meaning of "trade" and "commerce" under S.C. Code Ann. §39-5-10.

470. The South Carolina Unfair Trade Practices Act ("South Carolina UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce S.C. Code Ann. §39-5-20(a).

471. In the course of its business, Honda violated the South Carolina UTPA by knowingly misrepresenting and intentionally concealing material facts regarding the quality of the Class Vehicles and the availability, quality, and benefits of white paint and paint process used on the Class Vehicles, as detailed above. Specifically, in marketing, offering for sale/lease, and selling/leasing the defective Class Vehicles, Honda engaged in one or more of the following unfair or deceptive acts or practices which are proscribed by the South Carolina UTPA:

- representing that the Class Vehicles have characteristics or benefits that they do not have;
- representing that the Class Vehicles are of a particular standard and quality when they are not;
- advertising the Class Vehicles with the intent not to sell them as advertised;
- engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding, including failing to disclose the Paint Defect; and/or
- using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the advertisement and sale or lease of the Class Vehicles.

472. Honda's unfair and deceptive trade practices and acts have the potential for repetition and adversely impact the public interest. Honda sold thousands of Class

Vehicles impacted by the Paint Defect to South Carolina Class members. In each transaction, Honda engaged in uniform unfair and deceptive trade practices and uniformly misrepresented the qualities, value, and durability of the Class Vehicles, provided incomplete information regarding the availability and quality of white paint, and failed to disclose the Paint Defect to every South Carolina class member. Thousands of South Carolina citizens have been affected by Honda's deceptive conduct.

473. Honda's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiff Parvin and South Carolina class members, and Honda misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff Parvin and South Carolina class members would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Plaintiff Parvin and South Carolina Class members would not have purchased or leased the Class Vehicles, would have paid significantly less for them, or would have purchased the Class Vehicles in alternative colors.

474. Plaintiff Parvin and South Carolina class members had no way of discerning that Honda's representations were false and misleading, or otherwise learning the facts that Honda had concealed or failed to disclose.

475. Honda had an ongoing duty to Plaintiff Parvin and South Carolina Class members to refrain from unfair and deceptive practices under the South Carolina UTPA in the course of its business. Specifically, Honda owed Plaintiff Parvin and South Carolina Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts Plaintiff Parvin and South Carolina Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

476. Plaintiff Parvin and South Carolina Class members suffered ascertainable loss and actual damages as a direct and proximate result of Honda's concealment,

misrepresentations, and/or failure to disclose material information.

477. Pursuant to S.C. Code Ann. §39-5-140(a), Plaintiff Parvin and the South Carolina Class members seek an order awarding damages, treble damages, and any other just and proper relief available under the South Carolina UTPA.

## FOURTEENTH CLAIM FOR RELIEF
## VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION ACT
## (Tex. Bus. & Com. Code §§ 17.41, *et seq.*)

478. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

479. This Count is brought by Mr. Yang on behalf of the Texas Class under Texas law because Mr. Yang purchased her Class Vehicle in Wisconsin.

480. Plaintiff Yang and the Texas Class members are "consumers" within the meaning of Tex. Bus. & Com. Code § 17.45(4).

481. Honda is engaged in "trade" or "commerce" within the meaning of Tex. Bus. & Com. Code § 17.45(6).

482. The Class Vehicles are "goods" within the meaning of of Tex. Bus. & Com. Code § 17.45(1).

483. The Texas Deceptive Trade Practices-Consumer Protection Act ("Texas DTPA") declares unlawful "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Tex. Bus. & Com. Code § 17.46(a).

484. In the course of its business, Honda violated the Texas DTPA by knowingly misrepresenting and intentionally concealing and omitting material facts regarding the quality of the Class Vehicles and the quality and benefits of the paint and paint process used on the Class Vehicles, as detailed above.

485. Specifically, in marketing, offering for sale/lease, and selling/leasing the defective Class Vehicles, Honda engaged in one or more of the following unfair or deceptive acts or practices which are proscribed by the Texas DTPA:

- representing that the Class Vehicles have characteristics or benefits that they do not have;

- representing that the Class Vehicles are of a particular standard and quality when they are not;
- advertising the Class Vehicles with the intent not to sell them as advertised; and/or;
- Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding; and/or
- Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the advertisement and sale or lease of the Class Vehicles.

486. Honda's scheme and concealment of the true characteristics of the Class Vehicles were material to Mr. Yang and the Texas Class members, and Honda misrepresented, concealed, or failed to disclose the truth with the intention that Mr. Yang and the Texas Class members would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Mr. Yang and the Texas Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

487. Mr. Yang and the Texas Class members had no way of discerning that Honda's representations were false and misleading, or otherwise learning the facts that Honda had concealed or failed to disclose.

488. Honda had an ongoing duty to Mr. Yang and the Texas Class members to refrain from unfair and deceptive practices under the Texas DTPA in the course of its business. Specifically, Honda owed Mr. Yang and the Texas Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from Mr. Yang and the Texas Class member, and/or it made representations that were rendered misleading because they were contradicted by withheld facts.

489. Mr. Yang and the Texas Class members suffered ascertainable loss and actual damages as a direct and proximate result of Honda's concealment, misrepresentations, and/or failure to disclose material information.

490. More than sixty (60) days prior to filing this action, Plaintiff Yang sent a written notice by certified mail, return receipt requested, to Honda in compliance with Tex. Bus. & Com. Code § 17.505(a), on behalf of herself and the other members of the proposed Texas Class. That notice, dated August 15, 2025, included a detailed description of Honda's false, misleading, and deceptive acts and practices, the amount of economic damages, expenses, and attorneys' fees incurred, and a demand for relief. Plaintiff Yang notified Honda of the statutory claims asserted in this Complaint and provided Honda with an opportunity to resolve those claims. Honda failed and refused to provide the relief demanded within the statutory period

491. Pursuant to Tex. Bus. & Com. Code § 17.50, Mr. Yang and the Texas Class members seek economic damages, treble damages for knowing conduct, and any other relief to which they are entitled, including attorneys' fees and costs.

## FIFTEENTH CLAIM FOR RELIEF
## VIOLATION OF VIRGINIA CONSUMER PROTECTION ACT
## (VA. CODE ANN. §59.1-196, *et seq.*)

492. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

493. This Count is brought by Ms. Gimenez-Picou on behalf of the Virginia Class under Virginia law because Ms. Gimenez-Picou purchased her Class Vehicle in Virginia.

494. Honda, Ms. Gimenez-Picou, and the Virginia Class members are "persons" within the meaning of VA. CODE ANN. §59.1-198.

495. Honda is and was at all relevant times a "supplier" under VA. CODE ANN. §59.1-198.

496. The sale or lease of the Class Vehicles is and was at all relevant times a "consumer transaction" within the meaning of VA. CODE ANN. §59.1-198.

497. The Virginia Consumer Protection Act ("Virginia CPA") prohibits certain "fraudulent acts or practices committed by a supplier in connection with a consumer transaction" and lists prohibited practices which include:

(5) Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits;

(6) Misrepresenting that goods or services are of a particular standard, quality, grade, style or model;

(8) Advertising goods or services with intent not to sell them as advertised, or with intent not to sell at the price or upon the terms advertised;

(14) Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction.

498. In the course of its business, Honda violated the Virginia CFA by knowingly misrepresenting and intentionally concealing material facts regarding the quality of the Class Vehicles and the quality and benefits of the paint and paint process used on the Class Vehicles, as detailed above. Specifically, in marketing, offering for sale/lease, and selling/leasing the defective Class Vehicles, Honda engaged in one or more of the following unfair or deceptive acts or practices which are proscribed by the Virginia CFA:

- representing that the Class Vehicles have characteristics or benefits that they do not have;
- representing that the Class Vehicles are of a particular standard and quality when they are not;
- advertising the Class Vehicles with the intent not to sell them as advertised; and/or;
- Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding; and/or
- Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the advertisement and sale or lease of the Class Vehicles.

499. Honda's scheme and concealment of the true characteristics of the Class Vehicles were material to Ms. Gimenez-Picou and the Virginia Class members, and

Honda misrepresented, concealed, or failed to disclose the truth with the intention that Ms. Gimenez-Picou and the Virginia Class members would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Ms. Gimenez-Picou and the Virginia Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

500. Ms. Gimenez-Picou and the Virginia Class members had no way of discerning that Honda's representations were false and misleading, or otherwise learning the facts that Honda had concealed or failed to disclose.

501. Honda had an ongoing duty to Ms. Gimenez-Picou and the Virginia Class members to refrain from unfair and deceptive practices under the Virginia CPA in the course of its business. Specifically, Honda owed Ms. Gimenez-Picou and the Virginia Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from Ms. Gimenez-Picou and the Virginia Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

502. Ms. Gimenez-Picou and the Virginia Class members suffered ascertainable loss and actual damages as a direct and proximate result of Honda's concealment, misrepresentations, and/or failure to disclose material information.

503. Pursuant to VA. CODE ANN. §59.1-204, the Virginia Class members seek an order awarding damages, treble damages, and any other just and proper relief available under the Virginia CPA.

**SIXTEENTH CLAIM FOR RELIEF**

**VIOLATION OF WASHINGTON CONSUMER PROTECTION ACT**

**(WASH. REV. CODE §19.86.010 *et seq.*)**

504. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

505. This Count is brought by Ms. Radigan on behalf of the Washington Class under Washington law because Ms. Radigan purchased her Class Vehicle in

Washington.

506. Honda, Ms. Radigan, and the Washington Class members are "persons" within the meaning of WASH. REV. CODE §19.86.010(1).

507. Honda is and was at all relevant times engaged in "trade" or "commerce" within the meaning of WASH. REV. CODE §19.86.010(2).

508. The Washington Consumer Protection Act ("Washington CPA") broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." WASH. REV. CODE §19.86.020.

509. In the course of its business, Honda violated the Washington CFA by knowingly misrepresenting and intentionally concealing material facts regarding the quality of the Class Vehicles and the quality and benefits of the paint and paint process used on the Class Vehicles, as detailed above. Specifically, in marketing, offering for sale/lease, and selling/leasing the defective Class Vehicles, Honda engaged in one or more of the following unfair or deceptive acts or practices which are proscribed by the Washington CFA:

- representing that the Class Vehicles have characteristics or benefits that they do not have;
- representing that the Class Vehicles are of a particular standard and quality when they are not;
- advertising the Class Vehicles with the intent not to sell them as advertised; and/or;
- Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding; and/or
- Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the advertisement and sale or lease of the Class Vehicles.

510. Honda's scheme and concealment of the true characteristics of the Class Vehicles were material to Ms. Radigan and the Washington Class members, and Honda misrepresented, concealed, or failed to disclose the truth with the intention that Ms.

Radigan and the Washington Class members would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Ms. Radigan and the Washington Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

511. Ms. Radigan and the Washington Class members had no way of discerning that Honda's representations were false and misleading, or otherwise learning the facts that Honda had concealed or failed to disclose.

512. Honda had an ongoing duty to Ms. Radigan and the Washington Class members to refrain from unfair and deceptive practices under the Washington CPA in the course of its business. Specifically, Honda owed Ms. Radigan and the Washington Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from Ms. Radigan and the Washington Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

513. Ms. Radigan and the Washington Class members suffered ascertainable loss and actual damages as a direct and proximate result of Honda's concealment, misrepresentations, and/or failure to disclose material information.

514. Pursuant to WASH. REV. CODE §§19.86.140 and 19.86.090, the Washington Class members seek an order awarding damages, treble damages, and any other just and proper relief available under the Washington CPA.

## SEVENTEENTH CLAIM FOR RELIEF
## VIOLATION OF THE WISCONSIN DECEPTIVE TRADE PRACTICES ACT
## (WIS. STAT. §100.18, *et seq.*)

515. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

516. This Count is brought by Ms. Beaton on behalf of the Wisconsin Class under Wisconsin law because Ms. Beaton purchased her Class Vehicle in Wisconsin.

517. Honda is a "person, firm, corporation or association" within the meaning of

WIS. STAT. §100.18(1).

518. Ms. Beaton and The Wisconsin Class members are members of "the public" within the meaning of WIS. STAT. §100.18(1).

519. The Class Vehicles are "merchandise" within the meaning of WIS. STAT. §100.18(1).

520. The Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA") prohibits a "representation or statement of fact which is untrue, deceptive or misleading." WIS. STAT. §100.18(1).

521. In the course of its business, Honda violated the Wisconsin DTPA by knowingly misrepresenting and intentionally concealing material facts regarding the quality of the Class Vehicles and the quality and benefits of the paint and paint process used on the Class Vehicles, as detailed above.

522. Specifically, in marketing, offering for sale/lease, and selling/leasing the defective Class Vehicles, Honda engaged in one or more of the following unfair or deceptive acts or practices which are proscribed by the Wisconsin DTPA:

- representing that the Class Vehicles have characteristics or benefits that they do not have;
- representing that the Class Vehicles are of a particular standard and quality when they are not;
- advertising the Class Vehicles with the intent not to sell them as advertised; and/or;
- Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding; and/or
- Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the advertisement and sale or lease of the Class Vehicles.

523. Honda's scheme and concealment of the true characteristics of the Class Vehicles were material to Ms. Beaton and the Wisconsin Class members, and Honda misrepresented, concealed, or failed to disclose the truth with the intention that Ms.

Ms. Beaton and the Wisconsin Class members would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Ms. Beaton and the Wisconsin Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

524. Ms. Beaton and the Wisconsin Class members had no way of discerning that Honda's representations were false and misleading, or otherwise learning the facts that Honda had concealed or failed to disclose.

525. Honda had an ongoing duty to Ms. Beaton and the Wisconsin Class members to refrain from unfair and deceptive practices under the Wisconsin DTPA in the course of its business. Specifically, Honda owed Ms. Beaton and the Wisconsin Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from Ms. Beaton and the Wisconsin Class member, and/or it made representations that were rendered misleading because they were contradicted by withheld facts.

526. Ms. Beaton and the Wisconsin Class members suffered ascertainable loss and actual damages as a direct and proximate result of Honda's concealment, misrepresentations, and/or failure to disclose material information.

527. Pursuant to WIS. STAT. §100.18(11)(b)(2), the Wisconsin Class members seek an order awarding damages, double damages, and any other just and proper relief available under the Wisconsin DTPA.

## EIGHTEENTH CLAIM FOR RELIEF

## UNJUST ENRICHMENT

528. Plaintiffs reallege and incorporate by reference the allegations elsewhere in the Complaint as if set forth fully herein.

529. Plaintiffs bring this claim on behalf of themselves and the respective state Classes they seek to represent under the laws of the states where they purchased their Class Vehicles.

530. "Although there are numerous permutations of the elements of the unjust enrichment cause of action in the various states, there are few real differences. In all states, the focus of an unjust enrichment claim is whether the defendant was unjustly enriched. At the core of each state's law are two fundamental elements—the defendant received a benefit from the plaintiff and it would be inequitable for the defendant to retain that benefit without compensating the plaintiff. The focus of the inquiry is the same in each state." *In re Mercedes-Benz Tele Aid Contract Litig*., 257 F.R.D. 46, 58 (D.N.J. Apr. 24, 2009) (quoting *Powers v. Lycoming Engines*, 245 F.R.D. 226, 231 (E.D. Pa. 2007)).

531. Plaintiffs bring this claim as an alternative to the statutory claims asserted above..

532. Honda has received hundreds of millions of dollars in revenue from the sale of the Class Vehicles between late 2012 and the present.

533. This revenue was a benefit conferred upon Honda by Plaintiffs and Class members, individuals living across the United States.

534. Honda manufactured, marketed, and sold defective Class Vehicles to Plaintiffs and Class members, while actively concealing the vehicles' known defects and touting their quality, durability, and high resale value.

535. Honda benefitted from selling defective cars for more money than they were worth, at a profit, and Plaintiffs and the Class members have overpaid for the cars and, in some instances, been forced to pay to (unsuccessfully) repair the Paint Defect.

536. Plaintiffs and Class members elected to purchase or lease the Class Vehicles based on Honda's misrepresentations, deception, and omissions. Honda knew and understood that it would (and did) receive a financial benefit, and voluntarily accepted the same, from Plaintiffs and Class members when they elected to purchase or lease the Class Vehicles.

537. The Class Vehicles' defect, and Honda's concealment of the same, enriched Honda beyond its legal rights by securing through deceit and falsehood

millions of dollars in revenues between late 2012 and the present.

538. Therefore, because Honda will be unjustly enriched if it is allowed to retain the revenues obtained through falsehoods, deception, and misrepresentations, Plaintiffs and each Class member are entitled to recover the amount by which Honda was unjustly enriched at his or her expense.

539. Accordingly, Plaintiffs, on behalf of themselves and each Class member, seek damages against Honda in the amounts by which it has been unjustly enriched at Plaintiffs' and each Class member's expense, and such other relief as this Court deems just and proper

## JURY DEMAND

540. Plaintiffs demand a trial by jury on all issues.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of the members of the Classes, respectfully request that the Court certify the proposed Classes, including designating the named Plaintiffs as representatives of the respective state classes and appointing the undersigned as Class Counsel, and designating any appropriate issue classes, under the applicable provisions of Fed. R. Civ. P. 23, and that the Court enter judgment in Plaintiffs' favor and against Honda including the following relief:

a) A declaration that any applicable statutes of limitations are tolled due to Honda's fraudulent concealment and that Honda is estopped from relying on any statutes of limitations in defense;

b) Restitution, compensatory damages, and costs for economic loss and out-of- pocket costs;

c) Punitive and exemplary damages under applicable law;

d) Reimbursement and compensation of the full purchase price for any replacement paint job purchased by a Plaintiff or Class member;

e) A determination that Honda is financially responsible for all Class notices and the administration of Class relief;

f) Any applicable statutory or civil penalties;

g) An order requiring Honda to pay both pre-judgment and post-judgment interest on any amounts awarded;

h) An award of reasonable counsel fees, plus reimbursement of reasonable costs, expenses, and disbursements, including reasonable allowances for the fees of experts;

i) Leave to amend this Class Action Complaint to conform to the evidence produced in discovery and at trial; and

j) Any such other and further relief the Court deems just and equitable.

Dated: May 22, 2026

Respectfully submitted,

By:/s/ Daniel L. Keller

Daniel L. Keller
**KELLER, FISHBACK & JACKSON LLP**
28720 Canwood Street, Suite 200
Agoura Hills, CA 91301
Telephone: (818) 342-7442
Facsimile: (818) 342-7616
Email: dkeller@kfjlegal.com

Stephen J. Fearon, Jr. (subject to *pro hac vice*)
Paul V. Sweeny (subject to *pro hac vice*)
**SQUITIERI & FEARON, LLP**
205 Hudson Street, 7th Floor
New York, NY 10007
Telephone: (212) 421-6492
Facsimile: (212) 421-6553
Email: stephen@sfclasslaw.com
Email: paul@sfclasslaw.com

**Attorneys for Plaintiffs and the Proposed Classes**